(November 6, 1922.)

PUBLIC UTILITIES COMMISSION OF THE STATE OF IDAHO, Consisting of GEO. E. ERB, E. M. SWEELEY and J. M. THOMPSON, Respondent, and BOISE CITY, a Municipal Corporation, JESSIE M. HURTT and EDWARD STEIN, Intervenors and Respondents, and Mrs. CRUSA AROSTEGUI and JUAN YRIBAR, Intervenors and Respondents, v. NATATORIUM COMPANY, a Corporation, Appellant.

[211 Pac. 533.]

PERCOLATING WATERS — OWNERSHIP OF UNDER CONSTITUTIONAL AND STATUTORY PROVISIONS—ABSENCE OF INTENTION TO DEDICATE TO PUBLIC USE—ESSENTIAL ELEMENTS OF PUBLIC USE—EVIDENCE— NO JURISDICTION IN PUBLIC UTILITIES COMMISSION.

1. Percolating water existing in the earth belongs to the soil as a part of the realty, and may be used and controlled by the owner to the same extent as the land itself.

2. *Held*, that there is sufficient evidence in the record to justify the conclusion that no natural springs or streams, subterranean

Publisher's Note.

1. Land owner's rights in percolating waters, see note in 99 Am. St. 66.

Appropriation of percolating waters on public lands, see notes in 30 L. R. A. 186; 21 L. R. A., N. S., 76.

or otherwise, are cut off or interfered with by the sinking of the wells of appellant and the gathering of the hot water in question at the depth found into its pipes, or by the use of pumps for the purpose of increasing the flow of said water, such water so far as shown being merely percolating or seepage water arising out of the earth without an outlet through any definite channel, and not being shown to belong to any natural spring or stream or subterranean flow.

3. The constitution of this state, art. 15, secs. 1, 2 and 3, does not make all waters within the state public waters and subject as such to appropriation under its laws. The constitutional right to divert and appropriate water does not extend to private waters.

4. C. S., sec. 5556, declares that the public waters of the state consist only of such as flow in their natural channels, including the waters of natural springs and lakes. It does not enumerate or include percolating waters.

5. C. S., sec. 5572, is a statutory recognition of the private ownership of the waters of any spring located wholly upon the lands of the owner of the fee, expressly denies to the state the right to control the same, denies the right of appropriation without the consent of the owner of the fee, and gives to such owner the right of exclusive use. The ownership and use of percolating waters cannot be taken from the owner of the fee against his will, without compensation, nor otherwise than as provided by law.

6. Since the waters flowing from appellant's hot-water wells are private waters, the fact of distribution to a selected class of customers and the receiving of compensation therefor, the fact that the appellant company originally filed notices of location and appropriation of the hot waters of certain springs, the fact that the company was authorized by its charter to devote such water to a public use, in the absence of an unequivocal intention to dedicate to a public use, are not of themselves such acts or facts as would constitute appellant a public service corporation, inasmuch as such waters belonged to appellant as unqualifiedly as the land upon which the springs were found.

7. *Held*, that the evidence in this case did not warrant the respondent Public Utilities Commission in holding that the appellant either expressly or impliedly dedicated to a public use the hot water owned by it; it is therefore not a public service corporation subject to the jurisdiction of the commission, and the order of the commission so holding must be vacated.

APPEAL from the Public Utilities Commission. *Reversed.*

Johnson & Nixon, for Appellant.

The filing of the water right notice is not an implied dedication of the hot water to a public use. The right to the water was acquired by actual application to beneficial use independently of the statute. (*Sandpoint etc. Co. v. Panhandle Co.*, 11 Ida. 405, 83 Pac. 347; *Neilson v. Parker*, 19 Ida. 727, 115 Pac. 488; *Furey v. Taylor*, 22 Ida. 605, 127 Pac. 676; *Crane Falls Co. v. Snake River Irr. Co.* (on rehearing), 24 Ida. 63, 133 Pac. 655; *Haight v. Costanich*, 184 Cal. 426, 194 Pac. 26; *Bean v. Morris* (C. C. A.), 159 Fed. 651.)

The language of a water right appropriation notice does not in itself make the owner a public utility. (*Del Mar Water, Light & P. Co. v. Eshleman*, 167 Cal. 666, 140 Pac. 591; *Thayer v. California Dev. Co.*, 164 Cal. 117, 128 Pac. 21; *Allen v. Railroad Com.*, 179 Cal. 68, 175 Pac. 466, 8 L. R. A. 249; *De Pauw University v. Public Ser. Com.*, 253 Fed. 848.)

Neither the statute nor provisions of art. 15 of the constitution of Idaho can make a private use public, without unjustly interfering with private property in violation of the federal constitution. (*Marin Water & Power Co. v. Sausalito*, 168 Cal. 587, 143 Pac. 767; *Storey v. Richardson*, 186 Cal. 162, 198 Pac. 1057, 18 A. L. R. 750; *Stratton v. Railroad Com.*, 186 Cal. 119, 17 A. L. R. 72, 198 Pac. 1051; *Stoehr v. Natatorium Co.*, 34 Ida. 217, 200 Pac. 132; *Producers' Transp. Co. v. Railroad Com.*, 251 U. S. 226, 40 Sup. Ct. 131, 64 L. ed. 239; *Producers' Transp. Co. v. Railroad Com.*, 176 Cal. 499, 69 Pac. 59; *Associated Pipe Line Co. v. Railroad Com.*, 176 Cal. 518, 169 Pac. 62, L. R. A. 1918C, 849.)

The common-law doctrine that the owner of the land is the owner of the water developed and situated thereon ap-

plies where his right to the water does not come in conflict with the superior and paramount right of one who has appropriated the water for beneficial use in conformity with the statutes. (27 R. C. L., sec. 170; *Hutchinson v. Watson Slough Ditch Co.,* 16 Ida. 484, 133 Am. St. 125, 101 Pac. 1059, 23 L. R. A., N. S., 1109; *Schodde v. Twin Falls Water Co.,* 224 U. S. 107, 33 Sup. Ct. 470, 56 L. ed. 686; *King v. Chamberlin,* 20 Ida. 504, 118 Pac. 1099.)

The hot water in question may properly be regarded as within the expression "developed water" as used in some of the decisions and discussed in 2 Kinney on Irrigation, 2d ed., page 2187, sec. 1206, and which the author says belongs to the parties who, by their own exertion, discovered and developed the water. (*Reno v. Richards,* 32 Ida. 1, 178 Pac. 81.)

The settled doctrine in America as expressed in the later decisions may be said to fully recognize the private property rights to subterranean waters, in one who has developed the same on his own land, where the question of the correlative rights of other adjoining proprietors equally entitled to it does not arise, and subject to the maxim that one must. use his own so as not to injure his neighbor. (*Katz v. Walkinshaw,* 141 Cal. 116, 99 Am. St. 35, 70 Pac. 663, 74 Pac. 766, 64 L. R. A. 236; *Gagnon v. French Lick Springs Co.,* 163 Ind. 687, 72 N. E. 849, 68 L. R. A. 175; *Ohio Oil Co. v. Indiana,* 177 U. S. 190, 20 Sup. Ct. 576, 44 L. ed. 729; 20 Morrison Min. Rep. 466; *Horne v. Utah Oil Refining Co.* (Utah), 202 Pac. 815; *Southern Pac. R. R. Co. v. Dufour,* 95 Cal. 615, 30 Pac. 783, 19 L. R. A. 92.)

The provisions of art. 15 of the constitution are not self-executing but require legislation to carry them into effect. (*Boise City Irr. & Land Co. v. Turner,* 176 Fed. 373; *Palmer v. Railroad Com.,* 167 Cal. 163, 138 Pac. 997.)

The law itself has recognized the ownership of private waters and has excepted private waters from the provisions of the statute. (C. S., sec. 5572.)

"It is fundamental that no executive officer or board has the power to deprive a party of a vested right to the use of

water. (*Speer v. Stephenson,* 16 Ida. 707, 102 Pac. 365.) To permit this would clearly be depriving him of his property without due process of law.'' (*Sanderson v. Salmon River Canal Co.,* 34 Ida. 145, 199 Pac. 999.)

J. M. Lampert, for Respondent Boise City.

The disclaimer of public service made by a company's officer when the legal consequences of their conduct are drawn in question is not entitled to great weight, after many years of serving a substantial portion of the public. (*Public Service Com. v. Valley Mercantile Co.* (Mont.), P. U. R. 1921D, 803.)

The intention to which courts will give heed is the intention which finds expression in conduct and not that which is secreted in the heart of the owner. (*Indianapolis v. Kingsburry,* 101 Ind. 201.)

There is a physical service limit to all public utility plants, but if that portion of the public is served that can reasonably be served and to the limit of the available supply, especially if the supply is increased for the specific purpose of serving the maximum number of customers, it is a public service. (1 Wyman on Public Service Corporations, 239; *Public Service Com. v. Valley Service Com., supra.*)

A corporation, firm or individual employing an agency purchased at the expense of the taxpayers, and hence solely for public purpose for distribution of its product through pipes such as the company distributing hot water using the public streets and alleys, is in a public service. (12 R. C. L. 883.)

The acceptance of a franchise to use the public streets is almost conclusive evidence of public profession. (1 Wyman on Public Service Corporations, p. 183, sec. 215; *Urmaoga Tel. Co. v. Lorraine, etc.* (Ill.), P. U. R. 1920E, 243.)

This natural hot water based upon a water right filing secured from the state, tapping a subterranean flow and by the company's notice pledging to the state and to the public that the use of such water would be for domestic and other beneficial uses is very similar to the natural gas and water

power privileges which give to the owner a natural monopoly, and the rule making the distributors of such commodities public service corporations has been well established. (1 Wyman on Public Service Corporations, p. 74, sec. 94.)

"If virtual monopoly is made out as the permanent condition of affairs in a given business, then the law, it seems, will consider that calling public in its nature." (1 Wyman on Public Service Corporations, p. 133, sec. 156.)

"The question whether a corporation is or is not a public utility is determined by its acts, and not by what its charter provides." (*State ex rel. Dancigar & Co. v. Public Service Com.* (Mo.), P. U. R. 1919A, 353; *Re Appalachian Power Co.* (W. Va.), P. U. R. 1919D, 286; *Re New State Canal Co.* (Ariz.), P. U. R. 1919A, 672; *Re Portageville Light & Power Co.* (Mo.), P. U. R. 1919E, 586; *Re Union Electric Light & Power Co.* (Mo.), P. U. R. 1918E, 490; *Re Commonwealth Mining & Milling Co.* (Ariz.), P. U. R. 1915B, 536; *Yeatman v. Towers,* 126 Md. 513, P. U. R. 1915E, 811, 95 Atl. 158.)

"A company that holds itself out to serve the public within a given area with water upon specified terms is a public utility." (*Berry v. Oro Loma Farms Co.* (Cal.), P. U. R. 1917F, 631; *Van Dyke v. Geary,* 244 U. S. 39, 37 Sup. Ct. 483, 61 L. ed. 973; *Terminal Taxicab Co. v. Kutz,* 241 U. S. 252, Ann. Cas. 1916D, 765, 36 Sup. Ct. 583, 260 L. ed. 984; *Van Hossear v. Railroad Com.,* 184 Cal. 553, 194 Pac. 1003; *Clarksburg Light & Heat Co. v. Public Service Com.,* P. U. R. 1920A, 639; *Re Garden Home Water Works* (Or.), P. U. R. 1919D, 1921.)

Davidson & Davison, for Respondents Hurtt and Stein et al.

The use of all waters of the state sold, rented or distributed is a public use, subject to the regulation and control of the state, in the manner prescribed by law. (Const., sec. 1, art. 15; *Wilterding v. Greene,* 4 Ida. 773, 45 Pac. 134; *Speer v. Stephenson,* 16 Ida. 707, 102 Pac. 365.)

All of the water claimed by appellant was appropriated under the provisions of the constitution and statutes of the

state, and to entitle it to the use thereof there must have been an application to a beneficial use; this beneficial use included the sale, rental and distribution, and the consumer of such water under a sale, rental or distribution thereof acquired a vested right therein, subject to continued use and payment. (Const., art. 15, secs. 1, 2 and 3; *Murray v. Public Utilities Com.,* 27 Ida. 603, 150 Pac. 47, L. R. A. 1916F, 756; *Hard v. Boise City Irr. Co.,* 9 Ida. 589, 76 Pac. 331.)

The charter powers to "acquire, develop, hold springs, wells and streams of both hot and cold water, and to conduct the waters thereof to Boise City and vicinity in the county of Ada, state of Idaho, for the use of said city and the inhabitants thereof," followed by a performance of said acts, is a pursuit of the charter's powers sufficient to make the service a public utility. (*Del Mar Water Co. v. Eshleman,* 167 Cal. 666, 140 Pac. 948.)

The original company laying the pipes in the streets and alleys of Boise City, the Artesian Hot & Cold Water Co., was a water company organized under the laws of the state, and was controlled by the provisions of secs. 2710 to 2713, inclusive, of the Revised Statutes of 1887, in force at the time of its incorporation. (*Price v. Riverside Land & Irrigating Co.,* 56 Cal. 431; *Crow v. San Joaquin Irr. Co.,* 130 Cal. 309, 62 Pac. 562; *Fresno Canal Co. v. Parke,* 129 Cal. 437, 62 Pac. 87; *Merrill v. Southside Irr. Co.,* 112 Cal. 426, 44 Pac. 720.)

The water having been applied to a public use by a sale thereof cannot be again retaken for a private use. (*Riverside Land Co. v. Jarvis,* 174 Cal. 316, 163 Pac. 54; *Leavitt v. Larsen Irr. Co.,* 157 Cal. 82, 106 Pac. 404, 29 L. R. A., N. S., 213; *Limoneira Co. v. Railroad Com.,* 174 Cal. 232, 162 Pac. 1033.)

The use of the streets and alleys for the purpose of laying and maintaining pipes is of itself sufficient to fix the business of supplying water as a public business. (20 Cyc. 1160; *Hangen v. Albina Light & Power Co.,* 21 Or. 411, 28 Pac. 244, 14 L. R. A. 424; *Portland Natural Gas &*

*Oil Co. v. State,* 135 Ind. 54, 34 N. E. 818, 21 L. R. A. 639; *American Water Works Co. v. State,* 46 Neb. 194, 67 N. W. 711, 30 L. R. A. 447; *Seaton Mt. Electric Light, Heat & Power Co. v. Idaho Springs Invest. Co.,* 49 Colo. 122, 111 Pac. 834, 33 L. R. A., N. S., 1078.)

Roy L. Black, Attorney General, and A. H. Conner, Special Assistant Attorney General, for Commission.

Dedication is a question of intent, which is deduced from the acts and conduct of the owner. (*Hanson v. Proffer,* 23 Ida. 705, 132 Pac. 573; 18 C. J. 38, 54, 58; *Wood v. Hurd,* 34 N. J. L. 87; *City of Columbus v. Dahn,* 36 Ind. 330; *Lamar County v. Clements,* 49 Tex. 347; Elliott on Roads and Streets, 3d ed., secs. 138, 140.)

Use by the public constitutes an acceptance of the dedication. (*Morgan v. C. & A. R. R. Co.,* 96 U. S. 716, 24 L. ed. 743.)

A portion of the water appropriated may be dedicated to a public use and a portion of it reserved for private use. (*Del Mar Water L. & P. Co. v. Eshleman,* 167 Cal. 666, 140 Pac. 591; *Allen v. Railroad Com.,* 179 Cal. 68, 8 A. L. R. 249, 175 Pac. 466.)

The dedication may be to only a portion of the public. (*Lanning v. Osborne,* 76 Fed. 319; 1 Wyman, Public Service Corporations, sec. 271; *Pocantico Water Works Co. v. Bird,* 130 N. Y. 249, 29 N. E. 246; *Minnesota Canal & P. Co. v. Koochiching Co.,* 97 Minn. 429, 7 Ann. Cas. 1182, 107 N. W. 405, 5 L. R. A., N. S., 638.)

The common-law distinction made between percolating and other subterranean waters, and waters on the surface, has been expressly repudiated in the arid land states which recognize the priority of appropriation as distinguished from the riparian right principle. (Kinney on Irrigation, 2d ed., secs. 1155, 1188, 1193; *Katz v. Walkinshaw,* 141 Cal. 116, 90 Am. St. 35, 70 Pac. 663, 74 Pac. 766, 64 L. R. A. 236; *Malad Valley Irr. Co. v. Campbell,* 2 Ida. 411, 18 Pac. 52; *Hall v. Blackman,* 22 Ida. 556, 126 Pac. 1047.)

Seepage and percolating waters are considered as public waters in Idaho and as such are subject to appropriation. (*Le Quime v. Chambers,* 15 Ida. 405, 98 Pac. 415; *Bower v. Moorman,* 27 Ida. 162, Ann. Cas. 1917D, 665, 147 Pac. 496; C. S., secs. 5558, 5562.)

Subterranean waters, artesian waters, percolating waters and natural springs, whether formed from percolating or seepage waters or a subterranean stream, are subject to appropriation. (*Moe v. Harger,* 10 Ida. 302, 77 Pac. 645; *Van Camp v. Emery,* 13 Ida. 202, 89 Pac. 752; *City of Pocatello v. Bass,* 15 Ida. 1, 96 Pac. 120; *Josslyn v. Daly,* 15 Ida. 137, 96 Pac. 568, 18 L. R. A., N. S., 886; *Youngs v. Regan,* 20 Ida. 275, 118 Pac. 499; *Marshall v. Niagara Springs Co.,* 22 Ida. 144, 125 Pac. 208; *Walbridge v. Robinson,* 22 Ida. 236, 125 Pac. 812, 43 L. R. A., N. S., 100; *Tobey v. Bridgewood,* 22 Ida. 566, 127 Pac. 178; *Cottonwood etc. Co. v. Monastery,* 29 Ida. 761, 162 Pac. 242; *Donaldson v. Thousand Springs Power Co.,* 29 Ida. 735, 162 Pac. 334; *Breyer v. Baker,* 31 Ida. 387, 171 Pac. 1135; *Rabido v. Furey,* 33 Ida. 56, 190 Pac. 73.)

What is known as the "Colorado System" rejects completely the doctrine of riparian rights and rests entirely upon the theory that all of the waters in the state, of whatever nature they may be, are the property of the state, that they shall be devoted to the highest use, and the right to use such waters can only be acquired by application to a beneficial use. (Mills Irr. Manual, secs. 5, 21–25, inc.; *Yunker v. Nichols,* 1 Colo. 551; *Coffin v. Left Hand Ditch Co.,* 6 Colo. 443.)

Idaho follows the Colorado system. (Mills Irr. Manual, sec. 25; *Drake v. Earhart,* 2 Ida. 750, 23 Pac. 541; *Idaho Power Co. v. Stephenson,* 16 Ida. 418, 101 Pac. 821; *Hutchinson v. Watson Slough Ditch Co.,* 16 Ida. 484, 101 Pac. 1059.)

The whole theory of the law in Idaho is that in this arid region water must be subjected to the highest and greatest duty, and it must be the constant aim of judicial

construction to effectuate that purpose. (*Van Camp v. Emery, supra; Niday v. Barker,* 16 Ida. 73, 101 Pac. 254; *Nampa Irr. Dist. v. Petrie,* 28 Ida. 227, 153 Pac. 425; *Adams v. Twin Falls etc. Co.,* 29 Ida. 357, 161 Pac. 322.)

A locator of the public waters of the state acquires no property right in the water; he only acquires the right to use that water. (*Boise Irr. Co. v. Stewart,* 10 Ida. 38, 77 Pac. 25; *Bennett v. Twin Falls etc. Co.,* 27 Ida. 643, 150 Pac. 336; secs. 5556, 5558, C. S.)

If a railway company organizes, under sec. 5, art 11 of our constitution and the railway corporation laws passed pursuant thereto, it becomes a common carrier by virtue of the constitutional provision, regardless of what its intention may have been. No dedication to the public is necessary. (*Connolly v. Woods,* 13 Ida. 591, 92 Pac. 573; *McLean v. Dist. Court,* 24 Ida. 441, Ann. Cas. 1915D, 542, 134 Pac. 536; *Blackwell Lumber Co. v. Empire Mill Co.,* 28 Ida. 556, 155 Pac. 680; 29 Ida. 421, 160 Pac. 265.)

Where a person or corporation has "stood by and allowed the public to use his property as though it had been dedicated to the public use and has allowed private rights to grow up under that assumption, and in view of such belief and opinion, and a disturbance of those rights would amount to an injustice, an inequity or a fraud, the owner will thereafter be estopped to set up the true state of facts or assert his own title to the prejudice of the public or the private rights thus accrued." (*Village of Hailey v. Riley,* 14 Ida. 481, 95 Pac. 686.)

The mere sale, rental or distribution constitutes a dedication to the public or the portion thereof served under sec. 1, and a dedication to the use under sec. 4. (*Wilterding v. Green,* 4 Ida. 773, 45 Pac. 134; *Idaho Fruit Land Co. v. Great Western Co.,* 17 Ida. 273, 105 Pac. 562; *Brose v. Board of Directors,* 20 Ida. 281, 118 Pac. 504; *Mellen v. Great Western Co.,* 21 Ida. 353, 122 Pac. 30; *Niday v. Barker, supra; Hobbs v. Twin Falls Canal Co.,* 24 Ida. 380, 133 Pac. 899; *Childs v. Neitzel,* 26 Ida. 116, 141 Pac. 77.)

It is clear, from an examination of the irrigation cases decided by this court, that it is the sale, rental and distribution which constitutes the dedication to a public use. (*Adams v. Twin Falls etc. Co., supra; Shelby v. Farmers' Ditch Co.*, 10 Ida. 723, 80 Pac. 222; *Parrott v. Twin Falls Co.*, 32 Ida. 759, 188 Pac. 451.)

BUDGE, J.—This is an appeal from an order of the Public Utilities Commission, in which the commission held that the Natatorium Company was a public utility, as to its sale of the use of hot water to certain inhabitants of Boise City for heating and domestic purposes.

From the record it appears that in 1890, H. B. Eastman, Timothy Regan, W. H. Ridenbaugh and J. W. Cunningham acquired an option to purchase the SE. ¼ of the SE. ¼ of the SW.¼ of section 12, T. 3 N., R. 2 E., B. M., in Ada county, adjoining Boise City on the east, from Robert Wilson, and, due to certain surface indications, began prospecting beneath the surface of said land to secure a flow of hot water. They drilled two wells about 400 feet deep and secured a flow of hot water, enough to fill two six-inch casings.

When this land was purchased, on May 28, 1890, by the above-named individuals, it was deeded by Robert Wilson and wife to Eastman and Ridenbaugh. On April 27, 1891, Eastman and Ridenbaugh and their wives transferred this same property to the Boise Artesian Hot & Cold Water Company. On November 24 and 25, 1894, this company caused to be posted notices of location of a water right, as is more fully set out in the dissenting opinion written by Justice Dunn. This hot water was first diverted to the Natatorium, a bathing resort, and used for bathing and heating purposes, some time prior to May, 1892. The first pipe laid from the hot-water wells to the Natatorium consisted of two sizes, a ten-inch pipe down to a tree in front of the Natatorium, where a six-inch pipe and a ¾-inch pipe were taken off to serve that institution with hot water.

The present Natatorium Company was incorporated on September 15, 1917.

While the evidence is not the most satisfactory touching the amount of the flow of the wells used by the Natatorium, witness Drake testified that from the time the hot-water wells were completed in 1891 until the supply of hot water was increased approximately fifty per cent by pumping, about the year 1912, a six-inch main would carry all the hot water. This witness also further testified that it had been calculated that the Natatorium used eighty per cent of the flow of the hot-water wells.

In 1891, the hot water was piped to the home of one Moore and Eastman. About 1891, 1892 or 1893, a portion of this hot water was conveyed through mains, some distance down what is now known as Warm Springs Avenue and Idaho Street, to the Boise City National Bank Building.

On December 1, 1906, a sale of the Natatorium was made to the Boise Railroad Company, and on January 2, 1907, a correction deed was made to this same property. On September 17, 1917, one Miller, trustee, at a master's sale, purchased the Natatorium. The Natatorium was subsequently repurchased by the appellant and is now owned by it.

About the year 1912, in order to increase the flow of natural hot water from these springs, air pumps were installed. Later on, these proving unsatisfactory, electric pumps were installed and the natural flow of hot water increased approximately fifty per cent.

Gradually since the delivery of the first hot water to Moore and Eastman, residences in the vicinity of where the mains of the hot-water company now lie have been supplied with a portion of this hot water, for heating and domestic use, until there are now a total of 276 users, 173 of whom were heating customers, 81 summer and 22 winter domestic users.

It may be reasonably inferred that the maximum supply of hot water has been reached. These users of water were

not solicited, and there is no written contract fixing the tenure of their use. The arrangement would seem to be that the customers using the water pay for it annually in advance. Ordinarily there have been no changes made in the right to the use of this hot water by those who have used it. It has never been considered, so far as we have been able to ascertain from the record, as an appurtenance to the land or premises where used, or conveyed as such to subsequent purchasers of the premises where used.

The quantity of hot water delivered and the method of its use has at all times been controlled by the appellant.

It is not contended that the use of hot water by the Natatorium is such a public use as brings the appellant corporation under the jurisdiction of the Public Utilities Commission.

The question, therefore, for decision is whether the hot water distributed by the appellant to the various users thereof, exclusive of the Natatorium, has been dedicated to a public use. If this question is to be answered in the affirmative, the appellant company is a public utility and subject to the jurisdiction of the Public Utilities Commission. If these waters are public waters, the sale, rental or distribution of the same would be a public use and subject to the regulation and control of the state in the manner prescribed by law, and the use of the same would be controlled under the provisions of art. 15, secs. 1, 2 and 3 of the constitution. If these waters are private waters, in the absence of an unequivocal intention to and dedication thereof to a public use by the appellant, the appellant would not be a public service corporation, and therefore subject to regulation as a public utility. Such dedication is never presumed. (*Niles v. City of Los Angeles,* 125 Cal. 572, 58 Pac. 190.)

In my opinion the waters of these hot wells are not public waters, and were not when located by the original locators. Not being public waters, they were not subject to appropriation, except by the owners of the fee.

The evidence conclusively shows that the ground where these wells are now located was boggy or swampy, and at most the waters at that time were only seepage or percolating waters rising through the intervening soil.

In my opinion there is sufficient evidence to justify the conclusion that no natural springs, streams and subterranean streams are cut off or interfered with by reason of the sinking of the wells and the gathering of the water at the depth found, into the pipes, or by reason of the use of pumps for the purpose of increasing the flow. This being percolating or seepage water, merely, rising out of the earth, without an outlet through any definite channel, and no part of any natural spring or stream, or· any subterranean stream or flow, was not subject to appropriation, except by the owner of the fee. It was the property of the owner of the land upon which it stood, and under the well-recognized doctrine that percolating water existing in the earth belongs to the soil as a part of the realty, it may be used and controlled to the same extent by the owner of the land as the land itself. (*Bruening v. Dorr,* 23 Colo. 195, 47 Pac. 290, at 292, 35 L. R. A. 640.)

The owner of the fee was the owner of the *corpus* of the water. The right to appropriate subterranean waters is not involved in this case, as disclosed by the record, and the cases cited in support of the right to appropriate subterranean waters have no application.

The constitutional provisions, namely, art. 15, secs. 1, 2 and 3, do not declare that all waters of the state are public waters and subject to appropriation.

These waters were not appropriated at any time for strictly private use, but were diverted for use in the Natatorium, for the purpose of heating the building and to temper the water for bathing purposes.

C. S., sec. 5556, provides that all waters of the state when flowing in their natural channels, including the waters of all natural springs and lakes within the boundaries of the state are declared to be the property of the state, whose

duty it shall be to supervise their appropriation and allotment to those diverting the same therefrom for any beneficial purpose, and the right to the use of any of the waters of the state for useful or beneficial purposes is recognized and confirmed. This statute contains a limitation, in that it declares that the waters of the state consist of such waters only as flow in their natural channels, including the waters of all natural springs and lakes. This does not include percolating waters.

C. S., sec. 5572, is as follows: ''The department of reclamation is hereby prohibited from issuing or granting permits to divert or appropriate the waters of any lake not exceeding five acres in surface area at high water mark, pond, pool, or spring in this state, which is located or situated wholly or entirely upon the lands of a person or corporation, except to the person or corporation owning said land, or with his or its written permission, executed and acknowledged as required for the conveyance of real estate.''

This is a statutory recognition of the private ownership of any lake not exceeding five acres in surface area at high-water mark, and any pond, pool or spring in this state, located wholly or entirely upon the lands of the owner of the fee, and expressly denies to the state the right to control the same, and denies the right of appropriation without the consent of the owner of the fee, and gives to the owner of the fee the exclusive right of appropriation or use. And this ownership in percolating waters cannot be taken from the owner of the fee against his will and without his consent, without compensation and in the manner as provided by law.

I am not willing to subscribe to the theory that all waters within the borders of the state, which are found where nature places them, are public waters of the state, the property of the state and solely under the control of the state wherever found. To carry this doctrine to its logical conclusion, the owner of the fee who sinks a well upon his

premises and discovers water has but a qualified ownership in the soil and a limited right only to the use of the water found therein. Any person may condemn a right of way across the owner of the fee's premises to the well and divert the waters of the well not then being used by the owner of the fee, upon the theory that the water placed there by nature is the property of the state and subject to appropriation, for which the owner of the fee is entitled to no compensation except for the right of way. To hold to such theory is going beyond a safe and reasonable interpretation of the constitutional provisions heretofore cited and falls within no reasonable interpretation of the right to appropriate public waters of the state as fixed by the statutes of this state.

The case of *Le Quime v. Chambers,* 15 Ida. 405, 98 Pac. 415, 21 L. R. A., N. S., 76, does not support this theory. That case held in effect that percolating waters upon the public domain, when gathered, are subject to appropriation under our statute, and as such will be recognized and protected by the courts, but as will be observed in that opinion, that would not be the case if the land on which such waters were located had already been patented. An entirely different question would then arise, that is to say, had the land been patented prior to the diversion of such waters by the locator no right could have been acquired or no appropriation made of such waters by any person not the owner of the fee, without the latter's consent.

I think the correct principle of law is announced in the case of *King v. Chamberlin,* 20 Ida. 504, 118 Pac. 1099, where the court *inter alia* says: "In the first place, a land owner may use the surface of his land for any lawful purpose without let or hindrance from anyone. There is nothing unlawful in collecting and impounding surface and waste water; if he sees fit to turn his farm into a lake, he may lawfully do so, so long as he does not injure someone else in the process. Here the question of cutting off the flow of a natural stream or in any manner obstructing a

watercourse or stream of water is in no manner involved. The waters collected by respondents were wholly surface and flood waters. They built their dams and dikes so as to collect the water in the winter and springtime, and thus hold it on their lands throughout the season.''

In the instant case the water was collected beneath the surface of the soil and did not obstruct or interfere with any · watercourse upon the surface or beneath the soil. Whether the waters are collected on the surface or beneath the soil, the principle involved is the same, and further on in the opinion this court says:

''This it is as lawful for them to do as it would have been to sink a well on their premises and collect therein either surface water or the waters percolating through the ground. . . . . The constitutional right to divert and appropriate water does not extend to private water. . . . .

''Sec. 3, art. 15 of the constitution. is dealing with the water of a natural stream and provides, among other things, as follows: 'The right to divert and appropriate the unappropriated waters of any natural stream to beneficial uses shall never be denied,' etc. Sec. 3253 of the Rev. Codes, which provides for making applications to the state engineer for permits to appropriate water, has reference to 'public waters' and 'the waters of any natural stream, spring or seepage waters or lakes, or other public waters.' Neither the statute nor the constitution ever contemplated authorizing one man to appropriate and divert the property of another. Both the constitution and statute were dealing with the *public, unappropriated* waters of the state as distinguished from private property. The entire legislation of this state, as well as the repeated decisions of this court, has been along the line of encouraging economy in the use of water and collecting and impounding the same. If a man collect and impound surface and flood waters from his own land before they reach any natural stream or channel and hold the same on his own land and premises, the fact that he may not use it for irrigation or any other commer-

cial purpose does not render it any less his property or authorize anyone else to invade his property or appropriate and divert the same."

And in support of this principle, this court cites the case of *Metcalf v. Nelson,* 8 S. D. 87, 59 Am. St. 746, 65 N. W. 911, where that court had under consideration the right of a land owner to recover damages from one who entered upon his premises and diverted and carried away a large quantity of water from a spring located on his land. The court in passing upon that question said:

"As the hidden water in the plaintiff's soil belonged to him as a part of it, he might, by artificial means, separate it from the soil, and it would still belong to him. He might sink a well, into which such water would work its way, and the accumulation in the well would still be his, and subject to his proprietary control. (*Davis v. Spaulding,* 157 Mass. 431, 32 N. E. 650, 19 L. R. A. 1021.) If the water which fills this spring is not subject to the law of running streams, but to that of percolating water, did the plaintiff lose his ownership of it when it appeared upon the surface? If a cloud had burst on plaintiff's land, and filled a cavity thereon with rain, it would, while so confined, belong to plaintiff, and we are unable to see why or how the question of ownership can be made to depend upon which way the water comes from. Suppose this percolating water appeared at the surface only at the point of the spring, and at once sunk away again into the surrounding soil, resuming its character of wandering, seeping water, would the plaintiff's proprietary rights come and go with the appearance and disappearance of the water? It must be remembered that we are not dealing with a running stream, or with riparian rights, but simply with percolating waters which have combined and struggled to the surface on plaintiff's land. We think the plaintiff had more than the ordinary usufruct in the water of this spring, so long, at least, as it was held in the spring. He might consume or dispose of it all if he chose. He might convey it away in pipes, or carry it off in tanks. If medicinal, he might

bottle it, and sell it for the healing of the nations. It would be inconsistent with the maintenance of such right in plaintiff to allow that the defendant or any other stranger had also the right, in hostility to the plaintiff, to take and carry away water from the same spring."

While it will be conceded that in California the cases passing upon the right to appropriate percolating waters are not in harmony, in a great number of decisions the supreme court of that state has held that percolating waters cannot be appropriated under the statutes of that state. (*Southern Pac. R. Co. v. Dufour*, 95 Cal. 615, 618, 30 Pac. 783, 19 L. R. A. 92; *Hanson v. McCue*, 42 Cal. 303, 10 Am. Rep. 299; *Cross v. Kitts*, 69 Cal. 217, 222, 58 Am. Rep. 558, 10 Pac. 409; *Painter v. Pasadena L. & W. Co.*, 91 Cal. 74, 82, 27 Pac. 539; *Gould v. Eaton*, 111 Cal. 639, 644, 52 Am. St. 201, 44 Pac. 319.)

There is a clear distinction between the right to appropriate the waters of a subterranean stream and the right to appropriate percolating waters which form no part of a subterranean stream. (*Trustees etc. of the Village of Delhi v. Youmans*, 50 Barb. 316.) I do not wish to be understood that the right to appropriate the waters of subterranean streams does not exist in this state, as well as the right to appropriate all waters of natural springs, streams or lakes. My position is that mere percolating waters or waters gathered together in wells upon the lands of the owner of the fee are not subject to appropriation by a third party, either under the constitution or statutes of this state.

Neither am I in accord with the theory that it is incumbent upon the owner of the fee to establish the fact that the percolating water which is a part and parcel of the soil is not a part of a subterranean stream or basin or an underground lake. This burden rests upon the party seeking to make the appropriation.

If I understand correctly the position taken by Justice Dunn in his dissenting opinion, it is to this effect, that had the appellant in this case, after driving the wells and

36 Idaho.—20

gathering the water into pipes, conducted the same to the Natatorium only, for the purpose of heating the building and furnishing water for bathing purposes, this would not have constituted a public use, subject to the control of the commission, but added to that fact the further fact that the water was conducted through mains and pipes into dwelling-houses and a number of residences and business houses of the city, and thus distributed and sold, the water was thereby dedicated to a public use, and appellant became a public service corporation and subject to the control of the commission.

If the waters are public waters as distinguished from private waters, the act of distribution and sale under a franchise or otherwise may have constituted such a public use. But since the waters are not public waters, but private waters, the mere fact of distribution or the receiving of compensation for the use thereof, in the absence of an unequivocal intention to dedicate to a public use, would not be such a use as would make the appellant a public service corporation. And I am in accord with the views of Chief Justice Rice upon the point, namely, that the evidence submitted to the commission does not disclose an intentional dedication of the hot water of the appellant company to a public use.

The water being private water, it was private property and could not be impressed with a public use and subjected to the jurisdiction of the commission without the consent of appellant, express or implied, for to so hold would be in effect to take its property without due process of law.

The mere fact that the appellant company filed notices of location or appropriation of the hot waters, in and of itself was not such an act as would constitute it a public service corporation, whatever its notice may have contained. Nor would the fact that it was authorized by its charter to devote the hot water to a public use. The waters of the wells belonged to the appellant as much as the land upon which they were located. The filing of the notice of

appropriation gave them no greater right than they had theretofore enjoyed.

Appellant's every act from the date of its first distribution of hot water up until the hearing before the commission clearly showed an intention upon its part not to dedicate the hot water of these wells to a public use, but it sought in every reasonable way to avoid such dedication. Its arrangements with users were from year to year. There was no written contract or sale or lease or undertaking upon its part to furnish a continual flow. It reserved the right to furnish whom it pleased and where it pleased. It did not hold itself out to the public as being ready and willing upon demand to furnish service of its hot water without discrimination. It nowhere appears that the public was entitled to the hot water as a matter of right and not of grace, or that the appellant held itself out as being ready and willing to serve the public.

Its contracts were all private contracts between the users of the hot water and the company, and were made to a selected class of customers, and the moment that such a status arose and so long as it existed it could not be held to be a public utility.

As was said in *Del Mar Water, Light & Power Co. v. Eshleman*, 166 Cal. 666, 140 Pac. 591, at 596:

"One may acquire and hold a water supply and waterworks, and thereby distribute and sell water for domestic use and irrigation or other purposes, without engaging in public service. It may make such sales to particular persons, and in such a manner that the public would not be entitled to it. The mere fact, therefore, that a company having such powers has acquired a water supply and constructed waterworks constituting a system which it is operating for compensation does not necessarily justify the conclusion that it is engaged in public service, or that its water is dedicated to public use. The only effect of the adoption of such articles by a corporation is to give it the capacity to engage in such public service if it so desires. After having become incorporated in this manner, it has the

power to engage in such service in the same sense that an individual has power to engage in such service. It may or may not do so, and until it does, it cannot be said to be subject to the jurisdiction of the Railroad Commission."

See, also, *Thayer v. California Development Co.,* 164 Cal. 119, 128 Pac. 21; *Allen v. Railroad Com.,* 179 Cal. 68, 8 A. L. R. 249, 175 Pac. 466; *Stoehr v. The Natatorium Co.,* 34 Ida. 217, 200 Pac. 132; *Story v. Richardson,* 186 Cal. 162, 198 Pac. 1057, at 1059; *Newell v. Redondo Water Co.,* 55 Cal. App. 86, 202 Pac. 914; *Marin Water & Power Co. v. Town of Sausalito,* 168 Cal. 587, 143 Pac. 767.

Moreover, as is stated in Wyman on Public Service Corporations, vol. 1, sec. 200, pp. 167, 168:

"Even one who has acquired a virtual monopoly is not forced into public service against his will; it is only when he has held himself out in some way as ready to serve that he is bound thereafter to deal with all indiscriminately."

In my opinion the evidence in this case did not warrant the commission in reaching the conclusion that the appellant, either expressly or impliedly, dedicated to a public use the hot water owned by it, and failing to do this it is not a public service corporation, subject to the jurisdiction of the commission, and the commission erred in so holding.

The order appealed from should be reversed, and it is so ordered. Costs are awarded to appellant.

Lee, J., concurs.

McCARTHY, J., Concurring.—Respondents contend that, even if the hot water in question was originally private water owned by appellant, it has been dedicated to public use by the acts and conduct of appellant. It is true that property originally private can be dedicated to the public by the acts and conduct of the owner and thus burdened with a public duty. But "Dedication of the property of a corporation to public use is never presumed without evi-

dence of unequivocal intention." (*Stoehr v. The Natatorium Co.*, 34 Ida. 217, 200 Pac. 132.)

"Whether one engaged in the business of supplying water is engaged in a 'public utility' business depends on whether he held himself out expressly or impliedly as engaged in the business of supplying water to the public or to a limited portion of the public, such, for example, as could be served by his system or whether he merely held himself out as serving or ready to serve particular individuals as a matter of accommodation or for reasons peculiar and particular to them." (*Van Hoosear v. Railroad Com.*, 184 Cal. 553, 194 Pac. 1003.)

To be sure a secret or hidden intention cannot govern. The intention is inferred from the acts and conduct of the party. (*Hanson v. Proffer*, 23 Ida. 705, 132 Pac. 573.) The evidence in this case shows that the intention of the appellant, expressed in its acts and conduct, was not to unreservedly devote the surplus of hot water to the public or any portion thereof, but to permit individuals chosen by it, and on terms fixed by it, to use the hot water under a system of yearly rentals. Whenever it desired, it exercised control as to who should be granted the use of the water, and as to taking it away. I do not find evidence of an unequivocal intention to devote it to public use.

It is next contended that appellant is a public utility, irrespective of its intention, by operation of the provisions of the constitution and statutes of this state. The following are the provisions which should be considered:

Const., art. 15, 1. "The use of all waters now appropriated, or that may hereafter be appropriated for sale, rental or distribution; also of all water originally appropriated for private use, but which after such appropriation has heretofore been, or may hereafter be sold, rented, or distributed, is hereby declared to be a public use, and subject to the regulation and control of the state in the manner prescribed by law.

"2. The right to collect rates or compensation for the use of water supplied to any county, city, or town, or water

district, or the inhabitants thereof, is a franchise, and cannot be exercised except by authority of and in the manner prescribed by law.

"3. The right to divert and appropriate the unappropriated waters of any natural stream to beneficial uses, shall never be denied. Priority of appropriation shall give the better right as between those using the water; but when the waters of any natural stream are not sufficient for the ser-. vice of all those desiring the use of the same, those using the water for domestic purposes shall (subject to such limitations as may be prescribed by law) have the preference over those claiming for any other purpose; and those using the water for agricultural purposes shall have preference over those using the same for manufacturing purposes. And in any organized mining district those using the water for mining purposes or milling purposes connected with mining, shall have preference over those using the same for manufacturing or agricultural purposes. But the usage by such subsequent appropriators shall be subject to such provisions of law regulating the taking of private property for public and private use, as referred to in section 14 of Article I of this Constitution."

C. S., sec. 5556. "Water being essential to the industrial prosperity of the state, and all agricultural development throughout the greater portion of the state depending upon its just apportionment to, and economical use by, those making a beneficial application of the same, its control shall be in the state, which, in providing for its use, shall equally guard all the various interests involved. All the waters of the state, when flowing in their natural channels, including the waters of all natural springs and lakes within the boundaries of the state are declared to be the property of the state, whose duty it shall be to supervise their appropriation and allotment to those diverting the same therefrom for any beneficial purpose, and the right to the use of any of the waters of the state for useful or beneficial purposes is recognized and confirmed; and the right to the use of any of the public waters which have heretofore been

or may hereafter be allotted or beneficially applied, shall not be considered as being a property right in itself, but such right shall become the complement of, or one of the appurtenances of, the land or other thing to which, through necessity, said water is being applied; and the right to continue the use of any such water shall never be denied or prevented from any other cause than the failure on the part of the user thereof to pay the ordinary charges or assessments which may be made to cover the expenses for the delivery of such water."

C. S., sec. 5572. "The department of reclamation is hereby prohibited from issuing or granting permits to divert or appropriate the waters of any lake not exceeding five acres in surface area at high water mark, pond, pool or spring in this state, which is located or situated wholly or entirely upon the lands of a person or corporation, except to the person or corporation owning said land, or with his or its written permission, executed and acknowledged as required for the conveyance of real estate."

Article 15 of the constitution must be read as a whole. So reading it I conclude that section 1 thereof applies only to such waters as are public waters, owned by the state of Idaho. Considering article 15 and the above-mentioned statutes, I conclude that the ownership of water by the state, and the resulting right of appropriation, are confined to the waters of natural streams, either surface or subterranean, and do not extend to subterranean springs or percolating water, situated entirely on privately owned land, and not flowing in a natural channel. Water of the latter sort is part of the soil and belongs to the owner of the land. (*King v. Chamberlin,* 20 Ida. 504, 118 Pac. 1099; *Bruening v. Dorr,* 23 Colo. 195, 47 Pac. 290, at 292, 35 L. R. A. 640; *Vanderwork v. Hewes et al.,* 15 N. M. 439, 119 Pac. 567.) If anything to the contrary is to be found in *Le Quime v. Chambers,* 15 Ida. 405, 98 Pac. 415, and *Bower v. Moorman,* 27 Ida. 162, Ann. Cas. 1917C, 99, 147 Pac. 496, those decisions should be modified to the extent herein indicated.

One who seeks to subject another to the jurisdiction of the Public Utilities Commission on the ground he has sold or rented public waters of the state has the burden of showing that the waters are of that character. The evidence in this case as to the nature of the source of the hot water in question is meager. Such evidence as there is does not show to my mind that the source is a subterranean stream with a natural channel, but rather that it is a spring, or well of percolating water, located entirely beneath appellant's land. I conclude that the evidence fails to show that appellant has rented or sold public waters of the state. The evidence is, therefore, insufficient to support the finding that it is a public utility by operation of the constitution and statutes.

The question suggested in several places in the record as to whether appellant can deny individual water users the continued right to use the hot water is not necessarily involved in this case. The determination of whether appellant is or is not a public utility is not decisive of that question. It may depend upon the individual transactions the effect of which in that connection we are not called upon to decide.

RICE, C. J., Dissenting.—The principal opinion holds that the water involved in this case is the private water of appellant as distinguished from public water of the state. If the water was private property of appellant, it could not be impressed with a public use and subjected to the jurisdiction of the Utilities Commission without the consent of appellant, express or implied, for to do so would be to take its property without due process of law. From an examination of the record, I am unable to conclude that appellant intentionally dedicated the water to a public use. If, on the other hand, the water is public water of the state appellant's right thereto is usufructuary only and appellant cannot claim a vested right freed from the limitations and conditions under which the right may be exercised.

The evidence submitted to the commission does not disclose whether the source of the water supply is a subterranean stream, or a basin or an underground lake, or water percolating through the soil. If the source of supply is an underground stream or a lake, it is thought that there can be no doubt but that it is public water and subject to the same rules of appropriation as surface water. If appellant's wells are fed by percolating water, the result should be the same.

Under the common law of England, water percolating through the soil belongs to the owner of the soil, following the doctrine expressed in the maxim, *"Cujus est solum, ejus est usque ad inferos."*

In many of the states the doctrine above referred to has been applied and carried to its logical conclusion. (*Chatfield v. Wilson*, 28 Vt. 49; *Greenleaf v. Francis*, 18 Pick. (Mass.) 117; *Wheatley v. Baugh*, 25 Pa. St. 528, 64 Am. Dec. 721; *Wheelock v. Jacobs*, 70 Vt. 162, 67 Am. St. 659, 40 Atl. 41; *Huber v. Merkel*, 117 Wis. 355, 98 Am. St. 933, 94 N. W. 354, 62 L. R. A. 559; *Houston & Texas Cent. R. Co. v. East*, 98 Tex. 146, 107 Am. St. 620, 4 Ann. Cas. 827, 81 S. W. 279, 66 L. R. A. 738.) In other jurisdictions, what is known as correlative or reciprocal rights in underground water has been recognized. (*Bassett v. Salisbury Mfg. Co.*, 43 N. H. 569, 82 Am. Dec. 179; *Meeker v. City of East Orange*, 77 N. J. L. 623, 134 Am. St. 798, 74 Atl. 379, 25 L. R. A., N. S., 465; *Hathorn v. Natural Carbonic Gas Co.*, 194 N. Y. 326, 128 Am. St. 555, 16 Ann. Cas. 989, 87 N. E. 504, 23 L. R. A., N. S., 436; *Schenk v. Ann Arbor*, 196 Mich. 75, Ann. Cas. 1918E, 267, 163 N. W. 109, L. R. A. 1917F, 684; *Pence v. Carney*, 58 W. Va. 296, 112 Am. St. 963, 52 S. E. 702, 6 L. R. A., N. S., 266; *Debok v. Doak*, 188 Iowa, 597, 176 N. W. 631. See, also, 27 R. C. L., p. 1174.)

The question was presented to the supreme court of California in the case of *Katz v. Wilkinshaw*, 141 Cal. 116, 99 Am. St. 35, 70 Pac. 663, 74 Pac. 766, 64 L. R. A. 236, which has become a leading case among the western states.

In that case it was decided that, "the geological formation of the land, its topographical characteristics, and the aridity of the climate produced conditions so different from those of the countries from which our common-law rules were derived, that the well-known rule that the ownership of the soil in fee gave absolute title to all beneath the surface, including such subterranean water supplies, was held unsuitable to our conditions." (Article by Chief Justice Shaw, California Law Review, September 1922, p. 459.) But the decision rests fundamentally upon the doctrine of the common law that percolating water is part of the soil and the property of the owner of the soil, though in a qualified sense. The qualification consisted in applying the maxim, "*Sic utere tuo ut alienum non laedas*," and therefore the owner of the soil was limited to a reasonable use of the water which was recognized as his property. This case was adopted as authoritative by the supreme court of Utah in the case of *Horne v. Utah Oil Refining Co.* (Utah), 202 Pac. 815. The theory of correlative rights is very similar to that which governs the rights of riparian owners.

In the case of *Lux v. Haggin,* 69 Cal. 255, 4 Pac. 919, 10 Pac. 674, it was held that the adoption of the common law by that state had carried with it the law of riparian rights, which when they became vested could not be interfered with, except upon due compensation. In that state, and in several other western states, the doctrine of riparian rights has been maintained and enforced in connection with the antagonistic doctrine of water rights founded upon appropriation, which is generally known as the Colorado system. Idaho, early in its history, adopted the Colorado system. (*Drake v. Earhart,* 2 Ida. 750, 23 Pac. 541.) The rights of a riparian owner always yield to the rights of an appropriator whenever they come in conflict. (*Hutchinson v. Watson Slough Ditch Co.,* 16 Ida. 484, 133 Am. St. 125, 101 Pac. 1059; *Schodde v. Twin Falls Land & Water Co.,* 224 U. S. 107, 32 Sup. Ct. 470, 56 L. ed. 686.)

The doctrine of correlative or reciprocal rights in percolating water, being based upon the recognition of a qualified ownership in the water underneath the soil, is fraught with some difficulties which appeal to the minds of those accustomed to follow the principles of the Colorado system. In connection with this system, and as a necessary concomitant thereto, arose the principle of first in time first in right. Under the theory of correlative rights one may, under certain circumstances, improve his own land to the detriment or destruction of the crops, trees and shrubbery of an adjacent proprietor, although the use of the adjacent proprietor may have been long prior in time. (*Hudson v. Dailey*, 156 Cal. 617, 105 Pac. 748; *Burr v. Maclay Co.*, 154 Cal. 428, 98 Pac. 260.) It would also seem to follow logically that a person who had developed a supply of water, fed from subterranean percolation upon unoccupied lands, at great expense and carried the same to distant lands and applied it to a benficial use, could be deprived of a portion or perhaps all of his source of supply by subsequent locators upon the adjoining lands who make a reasonable use of the percolating water. In the Utah case of *Horne v. Utah Refining Co., supra,* it is not difficult to imagine a condition under which the first users of the water who had applied it to the growing of trees and shrubbery on their property for 25 or 30 years might be lawfully deprived of the use of the water or put to a great additional expense in raising it to the surface, if the right to the use of the water is fundamentally based upon the recognition of the ownership thereof, rather than upon that growing out of their right of appropriation.

The climatic and other conditions of the state of Idaho, particularly the southern portion thereof, in common with that of many other western states, are similar to those obtaining in the state of California. The reasons for declining to apply the rules of the common law are fully as cogent here as there. It is submitted that these reasons are so powerful that it requires the repudiation of the prin-

ciple of ownership in percolating water by the proprietor of the soil.

*Acton v. Blundell,* 12 Mees. & W. 354, seems to be the case in which the common-law doctrine was first stated. In that case the question, which was said to be one of equal novelty and importance, was stated as follows: "Whether the right to the enjoyment of an underground spring, or of a well supplied by such underground spring, is governed by the same rule of law as that which applies to, and regulates a watercourse flowing on the surface." It was stated that, considering the grounds and the origin of the law which was held to govern running streams and the consequences which would result if the same law was made applicable to springs beneath the surface, there is a marked and substantial difference beteen the two cases and that they are not to be governed by the same rule of law. It was further stated that the rights enjoyed by the proprietor of land over which running streams flow is and always has been public and notorious; but in the case of a well sunk by a proprietor on his own land, the water which feeds it from his neighbor's soil does not flow openly in the sight of the neighboring proprietor, but through hidden veins in the earth beneath its surface. No man can tell what changes these underground sources have undergone in the progress of time, and no proprietor knows what portion of the water is taken from beneath his own soil, how much he gives originally, how much he transmits only, or how much he receives. The court further considered the consequences resulting if the same laws were to be applied to surface water and percolating water, reaching the conclusion that such results would be very serious. The final conclusion was as follows: "Confining ourselves strictly to the facts stated in the bill of exceptions, we think the present case, for the reasons above given, is not to be governed by the law which applies to rivers and flowing streams, but that it rather falls within that principle which gives to the owner of the soil all that lies beneath its surface." It thus appears that the principle was not applied

because of any inherent quality in the thing itself, but because of expediency in view of conditions existing in England at the time. Following the same method of reasoning, the considerations which furnished the grounds for the decision in that case lose their persuasive force when applied to the conditions existing in this state, where beneficial use of all available water is necessary to its fullest development.

Owing to the conditions in this state, full recognition should be given to the doctrine that all the water within its borders which is found where nature places it is the property of and under the control of the state wherever found, whether running in well-defined streams above or below the surface of the ground or percolating through the soil, and is subject to appropriation whenever capable of being devoted to a beneficial use, except where prohibited by statute. The decisions of this court have been in accordance with this principle. (See *Le Quime v. Chambers,* 15 Ida. 405, 98 Pac. 415, 21 L. R. A., N. S., 76; *Josslyn v. Daly,* 15 Ida. 137, 96 Pac. 568.) In the case of *Bower v. Moorman,* 27 Ida. 162, Ann. Cas. 1917C, 99, 147 Pac. 496, it is said: ''In the case of *Le Quime v. Chambers,* 15 Ida. 405, 98 Pac. 415, 21 L. R. A., N. S., 76, the court says in effect, that percolating water is subject to appropriation under our statute, and as such will be recognized and protected by the courts.''

The decision in the case of *Newport Water Co. v. Kellogg,* 31 Ida. 574, 174 Pac. 602, was based upon the assumption that a prior appropriation of percolating water was entitled to protection.

The constitution does not contain a direct declaration that all water of the state is public water and subject to its control. It does declare, however, that ''The use of all waters now appropriated, or that may hereafter be appropriated for sale, rental or distribution; also of all water originally appropriated for private use, but which after such appropriation has heretofore been, or may hereafter be sold, rented, or distributed, is hereby declared to be a

public use, and subject to the regulation and control of the state in the manner prescribed by law." (Const., art. 15, sec. 1.) Also, "The right to collect rates or compensation for the use of water supplied to any county, city, or town, or water district, or the inhabitants thereof, is a franchise, and cannot be exercised except by authority of and in the manner prescribed by law." (Const., art. 15, sec. 2.) And further: "The right to divert and appropriate the unappropriated waters of any natural stream to beneficial uses shall never be denied." (Const., art. 15, sec. 3.) This provision is a limitation upon the power of the legislature and should not be construed to contain a renunciation by the state of its control over any of the waters therein.

C. S., sec. 5556, contains the following: "All waters of the state, when flowing in their natural channels, including the waters of all natural springs and lakes within the boundaries of the state are declared to be the property of the state, whose duty it shall be to supervise their appropriation and allotment to those diverting the same therefrom for any beneficial purpose, and the right to the use of any of the waters of the state for useful or beneficial purposes is recognized and confirmed; . . . . "

C. S., sec. 5562, is as follows: "All ditches now constructed or which may hereafter be constructed for the purpose of utilizing seepage, waste or spring water of the state, shall be governed by the same laws relating to priority of right as those ditches, canals and conduits constructed for the purpose of utilizing the waters of running streams."

C. S., sec. 5572, is as follows: "The department of reclamation is hereby prohibited from issuing or granting permits to divert or appropriate the waters of any lake not exceeding five acres in surface area at high water mark, pond, pool or spring in this state, which is located or situated wholly or entirely upon the lands of a person or corporation, except to the person or corporation owning said land, or with his or its written permission, executed and acknowledged as required for the conveyance of real estate."

The prohibition contained in the foregoing section is within the legislative discretion. It is not a recognition of the private ownership of the waters therein mentioned. It rather proceeds upon the theory that such waters are subject to the control of the state, but for reasons of policy, their appropriation, without the consent of the owner of the land on which they are situated, is prohibited.

The recognition of the dominion of the state over all the water within its borders is not obnoxious to the due process clause of the federal constitution. Control by the state of the waters within its boundaries appears to have been recognized as one of its proper functions wherever the rights of navigation are not involved. (*United States v. Rio Grande Irr. Co.*, 174 U. S. 690, 19 Sup. Ct. 770, 43 L. ed. 1136; *Clark v. Nash*, 198 U. S. 361, 4 Ann. Cas. 1171, 25 Sup. Ct. 676, 49 L. ed. 1085; *Kansas v. Colorado*, 206 U. S. 46, 27 Sup. Ct. 655, 51 L. ed. 956; *Producers Oil Co. v. Hanzen*, 238 U. S. 325, 35 Sup. Ct. 755, 59 L. ed. 1330; *Mettler v. Ames Realty Co.*, 61 Mont. 152, 201 Pac. 702; *Basey v. Gallagher*, 20 Wall. 670, 22 L. ed. 452; *Boquillas Land & C. Co. v. Curtis*, 213 U. S. 339, 29 Sup. Ct, 493, 53 L. ed. 822.)

No distinction can be made on account of the temperature of the water, nor on account of the fact that it is chiefly used for heating purposes. The heating of dwelling-houses is certainly a beneficial use, and comes within the definition of domestic purposes found in C. S., sec. 5566, which is as follows: "The phrase 'domestic purposes' as contained in this title shall be construed to include water for the household, and a sufficient amount for the use of domestic animals kept with and for the use of the household."

If the foregoing propositions are well founded, it follows that the appellant when it sank its wells and developed and diverted the subterranean water upon its property, even though its source was due to percolation, appropriated it, and when it began to sell, rent or distribute the same for compensation it devoted it to a use which the constitution

declares to be a public use and subject to regulation and control of the state in the manner prescribed by law.

The further question remains as to whether the legislature has provided for the regulation, by the Public Utilities Commission, of that portion of appellant's water which is sold, rented or distributed.

By C. S., sec. 2396, the term "public utility" includes a "water corporation." C. S., sec. 2392, defines a water corporation as follows: "The term water corporation when used in this chapter includes every corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any water system for compensation within this state." C. S., sec. 2391, defines the term "water system." The definition is very broad, and would include the various irrigation systems of the state. The section, however, specifically excludes Carey Act projects from the definition. C. S., sec. 2517, makes it the duty of the Commission to enforce the statutes relating to public utilities, the enforcement of which is not specifically invested in some other officer or tribunal. C. S., sec. 5641, provides for the fixing of rates by Boards of County Commissioners for the use of water for irrigation or other beneficial purposes from any ditch, canal or conduit. Though the provisions of this section when read alone would seem to be broad enough to include the system of appellant, a reference to C. S., sec. 5643, shows that the jurisdiction of Boards of County Commissioners was intended to be limited to ditches or other works conducting water for irrigation of lands. While the Department of Reclamation is given power to supervise water distribution by C. S., sec. 5606, it is clear that the jurisdiction of this department does not extend to the system of appellant. Appellant's system is therefore by law made subject to the control of the Public Utilities Commission under C. S., sec. 2517.

DUNN, J., Dissenting.—On October 28, 1920, the Public Utilities Commission of the state of Idaho, hereafter re-

ferred to as the commission, issued an order requiring appellant to show cause why it should not be stopped from increasing its rates for the users of hot water. The case brought by Mrs. Cruza Arostegui and Juan Yribar, complainants, against the Natatorium Company was consolidated with the order to show cause and the city of Boise, Edward Stein and Jessie S. Hurtt as users of hot water intervened. On November 15, 1920, appellant, appearing specially, moved to dismiss the proceedings "on the ground that said hot-water service is not a public utility, and the commission is without jurisdiction." Proceedings in this case were interrupted by an injunction granted by this court restraining the commission from proceeding until a determination of the appeal in the case of *William Stoehr v. Natatorium Co.*, 34 Ida. 217, 200 Pac. 132. On the determination of that case the injunction was dissolved. The commission then proceeded to take testimony on the motion to dismiss, found that the facts developed in the record "show the defendant to be a public utility in so far as the hot-water service has been furnished and distributed for heating and domestic use," and entered an order denying said motion. From said order appellant has brought the case to this court on appeal.

Appellant is the owner of certain wells just outside the city limits of Boise and is also the owner of a bathing resort within said city known as the Natatorium. These wells were drilled in the year 1890 by Hosea B. Eastman, Timothy Regan, W. H. Ridenbaugh and J. W. Cunningham, who thereby obtained a flow of hot water amounting to about 800,000 gallons per day. In the following year a corporation known as the Artesian Hot and Cold Water Company was organized, to which said wells were sold, and said corporation thereupon erected the bathing establishment called the Natatorium and conveyed thereto by means of a pipe-line a portion of the hot water from said wells. In 1902 the wells and the hot-water system were conveyed to a West Virginia Corporation, known as the Boise Artesian Hot and Cold Water Company, and in 1915 this cor-

poration conveyed the same property to an Idaho corpo-
ration called the Boise Artesian Hot and Cold Water
Company. Soon after the opening of the Natatorium it was
found that more hot water was produced than was required
for that establishment and the company then began the
sale and distribution of a portion of the surplus and
the collection of rates and compensation therefor. About
the year 1907 the Natatorium was sold by the owners of the
hot-water wells to the Boise Railroad Company and was
owned and operated by said railway company for about
10 years thereafter. The deed to the Natatorium provided
for the free use of hot water from said wells "sufficient
to maintain the Natatorium on said premises as a bathing
resort in like manner as the same is and heretofore has
been conducted," then described the size of pipe that should
govern the flow of hot water. While the Natatorium re-
mained in the hands of the railroad company the owners
of the wells increased their flow to the extent of about
400,000 gallons per day by installing pumps. There is tes-
timony in the record to the effect that this increase was
sought and used for the purpose of supplying additional
purchasers of hot water. All these water corporations by
their charters were authorized to carry on the business of
selling and distributing hot water just as that business has
been carried on from the beginning, and just as appellant
carried it on since September, 1920, when it became/ the
owner of said wells and hot-water system.

The water is distributed to appellant's customers by
means of a main a little over two miles in length extending
from a point near the Natatorium along Warm Springs
Avenue and Idaho Street, to a point on Idaho Street 120
feet west of the east line of 13th Street and through several
miles of laterals connected with said main. The entire
system, up to the property lines of the customers, is owned
by appellant. It is conceded that appellant and its prede-
cessors in interest, since the installation of this hot-water
system in Boise, now more than 25 years ago, have been

and are now collecting rates and compensation for the hot water so distributed to customers through said system.

It appears from the evidence that on November 25, 1899, the Artesian Hot and Cold Water Company, Limited, the first corporation to own and operate said wells and hot-water system, filed for record in the office of the recorder of Ada county, Idaho, a notice of water right claim as follows:

"To Whom It May Concern:

"Notice is hereby given that the Artesian Hot and Cold Water Company, Limited, a corporation created and existing under the laws of the state of Idaho, with its principal place of business at Boise City, Ada County, in the said state, heretofore on the 5th day of November, 1894, appropriated and is the owner and claimant of the following described water rights, to wit: The waters flowing from three artesian wells and each and every of said wells, to the extent of four and two hundred and seventy-three one-thousandths cubic feet per second of time; which said wells through and by means of which said water is diverted and appropriated are situated in the southeast quarter of the southeast quarter of the southwest quarter of Section twelve (12) in Township three (3) north, Range two (2) east of Boise Meridian, in Ada County, State of Idaho.

"That the location and specific uses for which said water is claimed are for domestic and for bathing and heating purposes and to warm the waters of a large plunge or swimming bath at a place of public resort, belonging to said company, known as the 'Natatorium,' situated about three thousand feet in a southwesterly direction from said wells; and also for sale for domestic uses and for bathing and heating purposes, and for all other purposes for which hot water may be used, and for irrigating and sprinkling, in Boise City in said County and along or near the line of the conduit or pipes used in conveying said water from said wells to and through the streets and alleys of Boise City, commencing at each of said wells and running north of west about one hundred and sixty feet through separate

pipes to a common main pipe; thence south 70 degrees, 15 minutes west 2514 feet to the southwest side of the public road known as Warm Springs Avenue; thence Westerly along said Avenue, 300 feet to a tee in said pipe by which a part of said water is diverted and runs in a southwesterly direction, 300 feet to said Natatorium building; and from said tee running in a Westerly direction along said Warm Springs Avenue, 5608 feet to the junction of Idaho Street in Boise City; thence westerly along Idaho Street, 5363 feet to a point 120 feet East of the east line of Thirteenth Street and about 13945 feet from said wells; together with all the lateral and distributing pipes and conduits connecting said main conduit with the buildings and premises where said water is or may be used.''

The recording of this notice seems to have been for the purpose of complying with an act of the Idaho legislature, Sess. Laws 1899, p. 380, some of the provisions of which are as follows:

''Sec. 2.   The right to the use of the waters of rivers, streams, lakes, springs, and of subterranean waters, may be acquired by appropriation.''

''Sec. 10.   All ditches, canals, or other works heretofore made, constructed, or provided, by means of which the waters of any stream have been diverted and applied to any beneficial use, must be taken to have secured the right to the waters claimed to the extent of the quantity which said works are capable of conducting, and not exceeding the quantity claimed without regard to, or compliance with, the requirements of this act; . . . . ''

''Sec. 12. . . . . All persons or corporations owning or claiming any water right or water rights must, within six months after this Act becomes a law, record with the recorder of the county a notice of the amount of the claim of appropriation, location and specific use, and the date of such appropriation.''

At the time of the recording of said notice said corporation was and for several years past had been engaged in the sale and distribution of said hot water to the City of

Boise and its citizens and collecting rates and compensation therefor, and such business has since the filing of said notice been continuously carried on in the same way by said corporation and its successors in interest down to and including the time of the hearing by said commission of the motion to dismiss.

The record shows that the number of purchasers of hot water before the pumps were installed was from 60 to 80, but that at the time of the hearing this number had grown to 276, 173 of whom were heating customers, 81 summer and 22 winter domestic users. While appellant claims to have made no sales of hot water for a longer period than one year, the record clearly shows that no contract for a definite period was made in any case, that as a rule customers were taken on without mention of a definite period of service, that in some instances assurance was given that the customer would never be deprived of the service so long as he desired it and was willing to pay for it, and that no customer who was receiving satisfactory service and who observed the regulations of the company was ever cut off. While it appears true that appellant did not solicit customers in the ordinary sense, it had a waiting list who according to men long connected with the management of the system, were supplied with hot water in the order in which their applications were registered as soon as the company found means of supplying the desired service. Thus it held itself out as not only willing to serve, but as desirous of serving, that portion of the general public living within such distances from its main as to make its hot water service satisfactory to both buyer and seller.

The sole question upon which this case depends is whether or not said hot water over and above the amount necessary to supply the Natatorium has been dedicated to a public use.

Appellant denies that there has been such dedication and insists that from the very beginning of the enterprise the owners have steadfastly maintained that such use is private and that they have never at any time performed any

acts that would convert the said use from a private to a public use. Respondents, on the other hand, contend that notwithstanding the protestations of appellant and its predecessors that the sole use of the waters sold to customers is and has been private, the legal effect of the acts of appellant and its predecessors is to make such use of said hot water a public use. The essential facts being admitted, the decisive question must be answered by reference to the constitution of this state. Sections of the state constitution applicable to this case are found in article 15 and are as follows:

"Sec. 1. The use of all waters now appropriated, or that may hereafter be appropriated for sale, rental or distribution; also of all water originally appropriated for private use, but which after such appropriation has heretofore been, or may hereafter be sold, rented or distributed, is hereby declared to be a public use, and subject to the regulation and control of the state in the manner prescribed by law.

"Sec. 2. The right to collect rates or compensation for the use of water supplied to any county, city, or town, or water district, or the inhabitants thereof, is a franchise, and cannot be exercised except by authority of and in the manner prescribed by law."

"Sec. 6. The legislature shall provide by law the manner in which reasonable maximum rates may be established to be charged for the use of water sold, rented or distributed for any useful or beneficial purpose."

The fact that appellant's predecessors in interest were authorized by their several charters to carry on the business of selling and distributing hot water would not be sufficient alone to impress the use in controversy with the character of a public use; neither would the fact that the original corporate owner of said hot water wells gave the notice of its claim as set out above, stating that one of the specific uses for which said hot water was claimed was "for sale for domestic uses and for bathing and heating purposes and for all other purposes for which hot water may be used,"

be sufficient alone to impress a public use upon said water. But when in the exercise of powers conferred by its charter the original corporation, the Artesian Hot and Cold Water Company, Limited, entered upon the sale and distribution of such hot water and collected rates and compensation therefor, and when, while it was actually so engaged, it filed said notice for record declaring that said waters were claimed for the public uses set out in said notice, namely, "for sale for domestic uses and for bathing and heating purposes," and when it and its successors, including appellant, for more than 20 years thereafter continuously carried on said business of selling and distributing hot water to Boise City and its citizens through miles of pipe laid in the streets of said city, collecting rates and compensation therefor, how can they be excepted from the plain language of the constitution above cited? This court has held that under the constitution of this state when the waters of the state are appropriated for sale, rental or distribution, such use becomes a public use and such waters are thereby dedicated to the public. (*Wilterding v. Green*, 4 Ida. 773, 45 Pac. 134; *Childs v. Neitzel*, 26 Ida. 116, 141 Pac. 77.)

In the recent case of *Stoehr v. Natatorium Co., supra,* this court stated the well-settled rule that "A corporation becomes a public service corporation, and therefore subject to regulation as a public utility, only when and to the extent that the business of such corporation becomes devoted to a public use." (*Thayer v. California Development Co.,* 164 Cal. 117, 128 Pac. 21.)

In the same case this court also said: "Dedication of the property of a corporation to public use is never presumed without evidence of unequivocal intention."

In the case of *Hansen v. Proffer,* 23 Ida. 705, 711, 132 Pac. 573, speaking of the dedication of a street, this court said: "We recognize the fact that the first essential of a valid dedication is an intention to do so on the part of the owner, but the intention to which the court gives heed is

not an intention hidden in the mind of the land owner, but an intention manifested by his acts.''

If the use of the water from these wells was a private one no reason can be seen for setting forth in the notice filed for record in 1899 that the water was claimed for a use made public by the constitution.

It may be admitted that the original appropriation of the hot water was for private use, namely, that it was for use in connection with the Natatorium. If the owners had continued to apply the water to such use and had made no use other than private of the surplus no question as to the dedication of such surplus could have arisen. No power known to the law could have compelled the owners to lay mains and sell and distribute this surplus water and accept compensation therefor. The owners were not content to do this. Seeing the opportunity to turn to their advantage what would otherwise go to waste, as intelligent business men they naturally proceeded to sell and distribute such surplus to as many customers as their limited supply would accommodate and to collect compensation therefor. They must be conclusively presumed to have known the provisions of the law above quoted with regard to such acts and to have intended to bring the surplus water within the terms of the constitution. As the demand for natural hot water grew they met it with an increased flow of 400,000 gallons per day by means of pumps. This increase appears to have been sought for no other purpose than for sale. In the book of regulations put out by the owners of the hot water in 1918 it is stated that ''when material prices are again normal we will prospect for more water.'' No other purpose for such prospecting appears from the record except to sell any additional water that may be discovered to many customers, who could doubtless be found.

It is difficult to conceive of acts which would more clearly bring this surplus water within the constitutional terms than those that have been performed by appellant and its predecessors through a long series of years. They have not acted under compulsion. They have voluntarily done

for years and are now doing the things that are declared by the constitution of this state to fix upon the use of this surplus water the character of a public use.

In the case at bar can appellant's denial of an intention to dedicate that portion of the hot water in controversy prevail over the fact that it deliberately and intentionally applied such water to a use which, under the constitution of this state, was then and is now a public use and that it is continuing to so apply it up to the present time? If additional water should be found other customers will be sought and found and other streets utilized for the laying of mains and laterals. If the use is wholly private, what will appellant say if the city of Boise objects to the further extension in its streets of a plant devoted wholly to private use?

In this case there is no claim of a dedication of the entire output of the hot-water wells, but only of that portion over and above the amount necessary for the Natatorium, which has been subjected to sale and distribution by appellant and its predecessors in interest, for which for many years they have collected rates or compensation. It is not essential to a valid dedication that the entire supply of hot water belonging to appellant shall be included, but a portion thereof may be dedicated to public use and the remainder reserved for private use. (*Del Mar Water L. & P. Co. v. Eshleman,* 167 Cal. 666, 140 Pac. 591; *Allen v. Railroad Com.,* 179 Cal. 68, 8 A. L. R. 249, 175 Pac. 466.)

It is admitted by all parties that the supply of hot water is limited and that it would not be possible at present to serve all persons in the city of Boise who probably desire such service, but this fact does not prevent a dedication to such limited portion of the public as has been or may be served. (*Lanning v. Osborne,* 76 Fed. 219, 334; Wyman on Public Service Corporations, vol. 1, sec. 271; *Pocantico Water Works Co. v. Bird,* 130 N. Y. 249, 29 N. E. 246, 248; *Minnesota Canal & P. Co. v. Koochiching Co.,* 97 Minn. 429, 7 Ann. Cas. 1182, 107 N. W. 405, 414, 5 L. R. A., N. S., 638, 649.)

The question has arisen as to whether the water in controversy is part of the public waters of the state. No direct evidence was offered on this point in the hearing before the board and no finding was made thereon. Appellant and its predecessors have assumed that this water is part of the public waters of the state and have dealt with it as such. In the record we find the following testimony by Mr. R. H. Johnson, leading counsel for appellant, concerning an injunction suit brought by one of appellant's predecessors in 1899 against Robert Wilson, from whom was acquired the land on which the hot water wells were sunk:

"Mr. Johnson: At the request of counsel for Intervenors and the Commission, I make the following statement as to the best of my recollection relating to the case of Boise Artesian Hot & Cold Water vs. Robt. B. Wilson, which, I believe, was instituted in the District Court of this County in about the year 1899: Previous to the institution of the suit, Mr. Wilson commenced sinking a well on his land immediately adjoining the land which had been purchased from Mr. Wilson for the development of the hot water wells now owned by the Natatorium Company. The owners of the hot water wells were very much concerned over this drilling by Mr. Wilson. He sunk his well as close as possible to the division line and as near the company's wells as he could and remain on his own land. The Company filed notices of water right appropriation on the theory that their hot water was obtained from a subterranean stream and that the company being a prior appropriator and having devoted the water to a beneficial use could enjoin Mr. Wilson in case he secured a flow of hot water which diminished the flow in the company's wells. As I remember it, Mr. Wilson sunk his well to a greater depth than the wells of the company and secured no hot water to speak of. He then prepared to shoot his well, that is, discharge a quantity of explosive in the bottom of his well. The company, or the officers of the company were advised that this might jeopardize the flow of water in their wells;

they at once commenced the above suit to enjoin Mr. Wilson from shooting his well. The District Court of Ada County issued the injunction, and the well was never shot. As I recall it, the case did not proceed to final settlement.''

From the fact that appellant's predecessors assumed this water to come from a subterranean stream and from the fact that they appropriated it as a part of the public waters of the state and obtained an injunction against a threatened interference with their appropriation on the theory that their supply came from a subterranean stream, and from the continuity and quantity of the flow, strongly suggesting a subterranean stream, I think this court would be justified in assuming that such water comes from a subterranean stream. In the opinion of the writer, however, this is immaterial, because, if private, the owners have dedicated the surplus water to a public use by selling and distributing it to Boise and its inhabitants, without contracts that in any way limited the right of the customer to a continuation of the service so long as he complied with the regulations of the seller.

If the men who were the first proprietors of the hot water and their successors were so fearful, as appellant now claims they were, that the sale of hot water might possibly fasten upon the surplus a public use, is it not strange that they did not expressly limit the time for which such service would be furnished to each customer and reserve the right to withhold or withdraw such service? Yet there is no evidence that they ever did this, which would have been the most natural and likely thing for men to do when acting under the influence of such fear. Such precautions would have clearly evidenced an intention not to dedicate, made known to every user.

It has been suggested by appellant that it has never applied to the city of Boise for a franchise and that it has no written franchise, but this is entirely immaterial. It has occupied several miles of streets of Boise for 30 years or more and has exercised rights which it is entitled to exercise only by virtue of a franchise, and it cannot be heard

to say now, in an attempt to defeat proper control in so far as its business is a public utility, that it is now and has been all these years operating without a franchise from the city of Boise. The question whether or not it has such franchise cannot be tried out in this action, but under the facts of the case for all purposes herein it must be conclusively presumed to have such franchise with whatever burdens and responsibilities go with it.

"The assumption of a franchise and the exercise of rights which can only be exercised thereunder will constitute an estoppel to deny the existence of such franchise for the purpose of defeating claims arising by reason of the existence of such franchise." (26 C. J., p. 1029, sec. 60.)

Aside from the constitutional provisions above set out, which, under the admitted facts, are decisive of this case, it has been held that:

"A private corporation which procures from a municipal corporation a franchise for supplying the latter and its inhabitants with water, and by virtue of which franchise it is permitted to and does use the streets and alleys of such municipal corporation in the carrying on of its business, becomes thereby affected with a public use and assumes a public duty." (*American Water Works Co. v. State,* 46 Neb. 194, 50 Am. St. 610, 64 N. W. 711, 30 L. R. A. 447; 2 Morawetz on Private Corporations, sec. 1129; *Seaton Mountain E. L. H. & P. Co. v. Idaho Springs I. Co.,* 49 Colo. 122, 111 Pac. 834, 33 L. R. A., N. S., 1178.)

"The household service which constitutes the characteristic type of modern employments which are public in character cannot be carried on without local franchises, as the use of the streets is almost always indispensable. Since this is true of surface railroads and other methods of urban transportation, of gas supply and electricity, of water and sewerage, the argument has often been made that the public character of these services is the result of the municipal franchises which they have received for the use of the public streets. But as has been seen earlier, this view of the matter mistakes consequence for cause; since, unless these

services were public in character, these franchises could not be constitutionally granted.'' (1 Wyman on Public Service Corporations, sec. 215.)

In a little book offered in evidence containing the regulations of the company owning this water in 1918 there is a brief historical sketch of the hot-water system. The extent to which this system at that time occupied the streets of Boise is indicated in the following statement taken from this book: ''The pipe-lines now consist of nine miles of iron pipe, about one-half of which is Matheson joint pipe, ranging from four to twelve inches in diameter. These lines constitute our principal mains. The other half is standard galvanized pipe, and constitutes our small branch and side lines which serve small groups of customers. These lines are from three quarters of an inch to two inches in diameter, and are small because of the fact that a larger line would allow the water to cool and would encourage waste.''

The act providing conditions of appeal from the Public Utilities Commission to this court, Session Laws 1921, page 141, contains the following provisions:

''Sec. 3. No new or additional evidence may be introduced in the Supreme Court, but the appeal shall be heard on the record of the commission as certified by it. The review on appeal shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order appealed from violates any right of the appellant under the constitution of the United States or of the State of Idaho. Upon the hearing the Supreme Court shall enter judgment, either affirming or setting aside the order of the commission. In case the order of the commission is set aside the commission upon its own motion or upon motion of any of the parties, may alter or amend the order appealed from to meet the objections of the court in the manner prescribed in Section 2501.''

''Sec. 8. The provisions of the Code of Civil Procedure relative to appeals from the district court, except in and

so far as they are inconsistent herewith, shall apply to appeals from orders of the public utilities commission.''

C. S., sec. 7170, which is one of the provisions of the Code of Civil Procedure referred to in section 8, *supra,* is as follows:

''Upon an appeal from a judgment the court may review the verdict or decision and any intermediate order or decision, if excepted to, which involves the merits or necessarily affects the judgment, except a decision or order from which an appeal might have been taken: *Provided,* That whenever there is substantial evidence to support a verdict the same shall not be set aside.''

It is clear from the record that the use to which appellant and its predecessors have applied that portion of the hot water over and above what is required for the Natatorium is a public use as defined by section 1, article 15, of the constitution of this state, and that by the acts of appellant and its predecessors such surplus hot water has been dedicated to such portion of the public as has been and may reasonably be served therewith. The sale and distribution of such hot water is therefore subject to regulation by the Public Utilities Commission of this state.

We do not regard the views herein expressed as in conflict with the position taken by this court in *Stoehr v. Natatorium Co., supra,* since that case turned on the stipulation of facts, of which the court said: ''In the present case the stipulation of facts clearly negatives any express or implied dedication by respondent of its hot-water service to the public, and justified the district court in finding that respondent was not a public utility.''

In this case facts additional to those contained in the stipulation in the Stoehr case and contradictory of some of them were before the commission. Among the facts stipulated in that case were the following: ''The said hot water was not developed and acquired for the purpose of sale to the general public, and neither the Natatorium Company nor any of its predecessors in interest have ever held it open to use or purchase by the general public but at all

times since its original discovery it was, and now is, intended for use primarily for the said Natatorium for sanitary and bathing purposes. The said surplus hot water has never been offered for sale to any person, and was only supplied to additional consumers after they had made application therefor and were ready and willing to pay such compensation therefor as was requested by the owners thereof, and such owners have on many occasions since said hot water was discovered, refused, for satisfactory reasons, to supply it to various persons who desire the same. . . . . And the said owners have always taken the position that the said natural hot water was strictly a private and not a public use and they never at any time held out that such hot water was for sale to the public in general and never at any time did or suffered any act or thing to be done or performed with the intention of dedicating said hot water to a public use.''

Some of the statements above quoted from the stipulation are somewhat evasive. For instance, while it may be literally true that ''said hot water was not developed and acquired for the purpose of sale to the general public, and neither the Natatorium Company nor any of its predecessors in interest have ever held it open to use or purchase by the general public,'' it is true as found by the commission and shown by the evidence that said water was claimed in part ''for sale for domestic uses and for bathing and heating purposes and for other purposes for which hot water may be used,'' that appellant and its predecessors have sold and are selling it to as many of the general public as they are able to supply, amounting at this time to about 270 customers, and that while it may also be literally true that they have not ''held it open to use or purchase by the general public,'' it is also true that they have in fact held it open to use and purchase by just as many of the general public as they were able to supply.

As shown by the authorities cited above in order to constitute the use of the hot water a public use it is not necessary that the entire surplus output of the wells should be

offered to the general public. The sale of this surplus to a portion of the general public is sufficient. If we understand the word "primarily" as applying to the first use to which the hot water was put it is true that it was "intended for use primarily for the said Natatorium," but if we understand this word to have reference to the quantity of hot water now used and to the importance of the use to which the hot water is put it is not true that "since its original discovery it was, and now is, intended for use primarily for the said Natatorium," and so the commission found on sufficient evidence.

In my opinion there is substantial evidence to sustain the finding of the commission that the facts developed in the record "show the defendant to be a public utility in so far as the hot-water service has been furnished and distributed for heating and domestic use," and the order of said commission appealed from should be affirmed.

.Petitions for rehearing denied.