**RAILROAD COMMISSION OF TEXAS et al. v. HUMBLE OIL & REFINING CO. et al.**

No. 8502.

Court of Civil Appeals of Texas. Austin.

Dec. 23, 1936.

Rehearing Granted in Part Feb. 17, 1937.

Wm. McCraw, Atty. Gen., Alfred M. Scott, Asst. Atty. Gen., and F. L. Kuykendall, Former Chief Examiner, Gas Utili-

ties Division, Railroad Commission of Texas, of Austin, for appellants.

J. E. Edmundson, J. Lee Dittert, and C. D. Duncan, all of Bellville, Powell, Wirtz, Rauhut & Gideon, and T. H. McGregor, all of Austin, and R. E. Seagler, Lee M. Sharrar, and Robt. F. Higgins, all of Houston, for appellee.

McCLENDON, Chief Justice.

This is a public utility natural gas rate case, brought by Humble (appellee Humble Oil & Refining Company) against the Commission (appellant Railroad Commission of Texas) and its members, in the nature of an appeal from that portion of a Commission order which fixed at 5 cents per thousand cubic feet (MCF) the maximum well-head price of gas in the Raccoon Bend field (Austin county) sold under contract by Humble to M & M (M & M Pipe Line Company, a public utility); and for ancillary injunctive relief. Certain royalty owners under mineral leases from which the involved gas was supplied to M & M were permitted to intervene as parties plaintiff.

Interveners contend that the order is void because they were not notified of or made parties to the Commission hearing. Otherwise the case presents two phases, involving, respectively, the issues: (1) Whether Humble in its relation to M & M is a public utility and its contracts and rates subject therefore to the Commission's regulatory jurisdiction; and (2) whether the well-head rate fixed by the Commission is unjust, unreasonable, or confiscatory.

The trial was to the court without a jury, and at the conclusion of the evidence judgment was rendered in favor of Humble and interveners, setting aside the Commission order and perpetually enjoining its enforcement. The court, upon seasonable request, filed findings of fact and law, predicating its judgment upon the holding that the Humble was not a public utility and not subject to the Commission's jurisdiction. The court declined to make findings upon the issue whether the order was unjust, etc.

Upon the above first phase and issue thereunder, appellees' contentions may be thus substantially stated: It was not the intention of the Public Utility Act (R.C.S. arts. 6050–6066, as amended [Vernon's Ann.Civ.St. arts. 6050–6066]) to classify as a public utility, and subject to the prescribed regulation, "a producer of gas who neither transports such gas over and across the highways of the State, nor exercises the right of eminent domain, nor sells such gas nor offers it for sale to the public generally, but who merely sells under private contract to one concern." If, however, such be the proper construction of the act, it is to that extent void, because "the Legislature cannot by legislative fiat change a private business into a public business when it is not such in fact."

The following decisions are cited in support of this contention: Pub. Utilities Comm. v. Natatorium Co., 36 Idaho, 287, 211 P. 533; Humbird L. Co. v. Pub. U. Comm. 39 Idaho, 505, 228 P. 271; Highland D. F. Co. v. Helvetia M. C. Co., 308 Ill. 294, 139 N.E. 418; Ohio Mining Co. v. Pub. U. Comm., 106 Ohio St. 138, 140 N.E. 143; Consumer's L. & P. Co. v. Phipps, 120 Okl. 223, 251 P. 63; Philadelphia City. Passenger Ry. Co. v. Pub. Ser. Comm., 271 Pa. 39, 114 A. 642; Clark v. Olson, 177 Wash. 237, 31 P.(2d) 534, 93 A.L.R. 240; State v. Spokane, etc., Ry. Co., 89 Wash. 599, 154 P. 1110, L.R.A.1918C, 675; Chippewa P. Co. v. R. R. Comm., 188 Wis. 246, 205 N.W. 900; Avery v. Vermont E. Co., 75 Vt. 235, 54 A. 179, 59 L.R.A. 817, 98 Am.St.Rep. 818; Nowata County Gas Co. v. Henry Oil Co. (C.C.A.) 269 F. 742; Texoma N. Gas Co. v. R. R. Comm. (D.C. 3-judge court) 59 F.(2d) 750.

In view of our holding to the effect that the Humble brought itself within the letter and spirit of the Public Utility Act under the specific terms of its contract with M & M, it is not necessary to review or discuss these decisions, or to express an opinion upon the general propositions embodied in the above contention. Their correctness may be conceded, arguendo, for the purposes of this appeal.

In the following statement we have copied, almost verbatim, excerpts from appellants' brief, omitting, however, the use of quotation marks:

Humble is chartered as a private oil corporation; its principal business consists in the production, transportation, refining, and sale of crude oil and its products. Less than 1 per cent. of its total volume of business consists of the sale of natural gas.

The Raccoon Bend field in Austin county is primarily an oil field. Humble there took oil and gas leases (semi-wildcat territory) and started development of the field primarily as an oil field during 1927; de-

veloped it as such throughout 1928 and 1929, producing from an oil sand at a depth of 3,000 feet. Later it developed a dry gas sand at a depth of 1,000 feet which to a large extent overlies the 3,000-foot oil stratum. In December, 1934, a new oil-bearing stratum, known as the "Conroe sand," was encountered at a depth of 3,400 feet underlying the 3,000-foot oil sand; and development thereof begun by the Humble. The Humble has a total of about 125 producing oil wells in the field, of which 43 are in the Conroe sand and of which about 50 are flowing wells and the remainder on pumps. About 10 or 12 of the flowing wells are in the 3,000-foot sand, and the 43 wells in the 3,400-foot Conroe sand are flowing. The company developed the 1,000-foot dry gas in an effort to produce oil; but having failed, used it for the production and storage of dry gas.

On June 7, 1928, the Humble made a contract with the M & M (at that time a co-partnership), the pertinent terms of which we quote:

"Whereas First Party (Humble) is the owner of oil and gas leases covering lands in what is known as the Raccoon Bend Oil Field in Austin County, Texas, productive of natural gas and may acquire other properties in said field during the life of this agreement productive of natural gas and Second Party (M & M) plans the construction of a pipe line distributing system for the delivery of natural gas to the neighboring towns and cities and desires to purchase gas from First Party for use in supplying its market through such system:—

"Now, therefore, in consideration of the mutual covenants and obligations herein undertaken and imposed, it is hereby agreed between the parties hereto as follows:

"1. Upon and subject to the other provisions hereof, First Party hereby sells and agrees to deliver to Second Party and Second Party hereby purchases and agrees to receive and pay First Party for a quantity of natural gas produced from the properties of First Party above described equal to the full requirements of the distributing system to be built by Second Party as herein contemplated between a minimum of one hundred eighty million (180,000,000) cubic feet per year over the period of the contract (to be delivered in approximately equal quantities of five hundred thousand cubic feet per day) and a maximum of two million (2,000,000) cubic feet per day if and while this quantity is currently available for delivery from said leases and properties after supplying the fuel needs of First Party in its business of producing, transporting and refining oil and gas; provided, however, that Second Party shall not be required to receive gas before the expiration of ninety (90) days from date hereof and shall not be required to receive gas in excess of a minimum of two hundred fifty thousand (250,000) cubic feet per day at any time prior to the expiration of six (6) months from date hereof. It is understood that the right of Second Party to require current delivery from day to day of the quantities of gas sold to it hereunder shall be prior and superior to the rights of other purchasers to require current deliveries to them from day to day of gas from said properties under contracts that may be made between such purchasers and First Party. So long as and while First Party has the minimum daily quantities herein agreed to be sold and purchased available for delivery from said properties, Second Party agrees to pay First Party for such quantities as hereinafter provided whether such quantities are taken and received by Second Party or not.

"2. First Party specifically reserves the right to manufacture gasoline from the gas produced from said properties and to deliver to Second Party residue gas from its gasoline plant in lieu of natural gas from the wells, and in such event the gasoline plant shall be the point of delivery and measurements shall be made at such point in the manner hereinafter provided for deliveries from the wells or central delivery points.

"3. Second Party agrees to proceed with due diligence in an effort to secure franchises for the sale of gas in the towns and cities in the territory near said Raccoon Bend field and to construct such pipe lines as may be necessary to serve the cities and towns in which franchises are obtained and customers that may be secured by diligent effort, and in any event to construct a minimum of forty (40) miles of main line pipe lines to such neighboring cities within twelve (12) months from date hereof. It agrees further to use its best efforts to develop a full market through such distributing system. Concurrently with the execution hereof Second Party is depositing with First National Bank of Houston, Texas, the sum of Ten Thousand Dollars ($10,000.00) to the credit of both parties hereto and to be held and disposed of by

said bank as herein provided. In the event Second Party shall fail to take a minimum of two hundred fifty thousand (250,000) cubic feet of gas per day from First Party hereunder within ninety (90) days from date hereof, or should fail to take a minimum of five hundred thousand (500,000) cubic feet of gas hereunder per day within six (6) months from date hereof, or should fail to complete as much as forty (40) miles of main line pipe lines to neighboring distributing points within twelve (12) months from date hereof, or during said period of time shall fail faithfully to carry out the other covenants and agreements herein made to be performed by it hereunder, First Party may at its option cancel this contract and require the delivery to it by said bank of said sum of Ten Thousand Dollars ($10,000.00) together with any interest thereon allowed by said bank, the amount of which deposit the parties hereto have agreed shall be liquidated damages to First Party resulting from such failure of performance by Second Party hereunder. The delivery of such sum to First Party by said bank as above provided shall not be taken, however, as settlement or payment for any gas delivered to Second Party hereunder. If at the expiration of twelve (12) months from date hereof Second Party has fully performed all of the covenants and obligations assumed by and imposed upon it hereunder and/or First Party shall not elect to cancel this contract on account of failure of performance, then said bank shall deliver said sum of Ten Thousand Dollars ($10,000.00) together with any interest allowed thereon to Second Party.

"4. Except as provided in Paragraph 2 hereof, deliveries of the gas sold and purchased hereunder shall be made by First Party under well pressure at the mouth of each well, or, upon election of First Party, at a central point or points in the field designated by First Party. Second Party shall lay its own lines and make its own connections with the wells or other delivery facilities fixed by First Party as above provided at Second Party's cost and expense. * * * So far as its rights permit, First Party hereby gives and grants to Second Party the right to maintain and operate its said pipe lines and facilities upon, across and over the leases and properties of First Party from which said gas is produced. * * *

"8. On or before the fifteenth (15th) day of each calendar month Second Party agrees to make payment to First Party at Houston, Texas, for all gas delivered by First Party to Second Party hereunder during the preceding calendar month at a price of twelve and one-half cents ($.125) per thousand cubic feet, such payment to be accompanied by a full statement in detail of daily quantities of gas delivered and of computations involved. In the event the quantity of gas delivered shall not equal the minimum quantities herein provided to be taken by Second Party, such payment shall be for the value of such minimum quantities as above provided. Past due amounts hereunder shall bear interest at eight per cent (8%) per annum. Second Party hereby gives and grants to First Party a lien upon all its pipe lines and other equipment and physical property comprising its distributing system through which the gas herein sold shall be delivered to market, as security for the payment of all amounts due First Party hereunder, which lien shall be enforcible as any mortgage lien. * * *

"12. Unless terminated as herein otherwise provided, this contract shall be and remain in full force and effect during the productive life of the above described leases and properties of First Party to but not beyond a period of ten (10) years from date hereof.

"13. This contract is not assignable by Second Party without the written consent of First Party but, subject to this provision, same shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, assigns and successors in interest. At the expiration of the ten (10) year term hereof, Second Party shall have a preferential right to purchase the available quantity of gas from said properties that First Party has for sale not to exceed the amount covered hereby, provided the price and terms offered are agreeable to First Party."

This contract was later assigned by the partnership to a corporation of the same name. The Humble gave its assent to this assignment.

On January 7, 1934, by agreement between Humble and M & M, the well head price was reduced from 12½ cents to 8 cents per MCF beginning October 1, 1934, and the life of the contract extended five years from date of its expiration. The minimum daily taking was raised from 500 to 750 and the maximum from 2,000 to 3,000 MCF. This minimum taking was conditioned that M & M's contract with

Prairie View normal was not terminated or suspended, in which latter event the minimum was to remain as before (500 MCF daily).

The trial court's holding that Humble was not a public utility is predicated upon the facts: (1) That there was no affiliation between it and M & M, and (2) that the contract was an "arm's length" one.

In the sense that the contract was voluntary as to each contracting party, neither being under any compulsion to enter into it, it may be proper to classify it as an "arm's length" one. Its proper classification from this viewpoint, however, we do not regard as controlling.

The paramount, if not in fact the only, purpose of the contract, so far as concerned the Humble, was to create and develop within the adjacent territory a domestic consumer market for its gas. It bound M & M expressly and affirmatively to "construct such pipe lines as may be necessary to serve the cities and towns" in the territory, in any event to construct a certain number of miles of pipe line within a stated time. It required a large forfeit to be deposited to insure that this be done. It bound M & M to "proceed with due diligence to secure franchises for the sale of gas" in such cities and towns and "to use its best efforts to develop a full market through such distributing system"; to take a minimum daily quantity of gas or pay the contract price for the deficiency. It secured performance of M & M's obligations by a lien upon all its property used in the distribution of the gas.

In the production and marketing of its gas there is no essential difference between the relation thus created and that which would have existed had the Humble formed a subsidiary corporation and made the same contract with it.

■ The relation created by the contract clearly, we think, brings Humble, as regards this portion of its business, within the letter and spirit of the Public Utility Act, as being a public utility and subject to the regulatory jurisdiction of the Commission. See State v. Lone Star Gas Co. (Tex.Civ.App.) 86 S.W.(2d) 484 (error ref.), for a full discussion, with analysis and construction of the Public Utility Act.

We pass to the above second phase and involved issue, whetheer the 5-cent rate is unjust, unreasonable, or confiscatory.

The following excerpt from the order presents its bases as arrived at by the Commission:

"In giving notice of the date of hearing of this matter, we specifically directed that the Humble Oil and Refining Company present to the Railroad Commission material facts upon which the reasonableness of the well head could be determined. After all evidence had been introduced affecting the M & M Pipe Line Company's properties and operations, Mr. Culberson, presiding officer at this hearing, requested the Humble Oil and Refining Company's representative to proceed with the introduction of testimony calculated to show what a reasonable well head price for gas should be. Instead of complying with this request, the Humble Oil and Refining Company again insisted upon their plea to the jurisdiction, which Mr. Culberson again overruled, whereupon the attorneys for the Humble Oil and Refining Company stated that Mr. Sue, one of their employees, was present to testify if the Railroad Commission desired to call him as a witness. Clearly this was not complying with the order of the Railroad Commission. Whereupon, Mr. H. C. Heard, Chief Accountant for the Gas Utilities Division of the Railroad Commission, was called as a witness and sponsored in evidence Exhibit No. 18. This exhibit reflected the total volume of gas produced in Austin County and in other counties in Texas by Humble Oil and Refining Company as well as the value of said natural gas as sworn to by an official of the Humble Oil and Refining Company for the year 1934. These figures were taken from the quarterly Gross Receipts Tax Statement filed by the Humble Oil and Refining Company under oath. There were also introduced Exhibits Nos. 19, 20, 21 and 22, which were photostatic copies of the quarterly Gross Receipts Tax Statement filed with the State Comptroller by Humble Oil and Refining Company for 1934. The affidavit attached to said quarterly reports reads as follows:

" 'The State of Texas, County of Harris.

" 'Before me appeared ———— being duly sworn, states that he is—(Title)—of—(Person or firm reporting)—with offices at—(City or town)—, that the foregoing report shows the total amount of gas produced and saved or imported, and subject to taxation, by—(Producer or importer)—during the quarter ending ————, and the average market value of said gas produced

or imported during said quarter and that said statement is true and correct.

" '_____.'

"Exhibit No. 18 shows that the Humble Oil and Refining Company produced in Austin County 1,881,726 MCF of natural gas and that the total value was $29,205.62, which is an average price of $.016482 per MCF. The exhibit shows that in the other counties in Texas the Humble Oil and Refining Company produced 10,175,910 MCF of natural gas and that the value was $130,549.01, which gives an average price of $.012829 per MCF. The total natural gas produced in Texas by the Humble Oil and Refining Company during 1934 was 12,057,636 MCF and the total value was $148,392.31, which gives an average price of $.012307 per MCF. In other words, in Austin County where M & M Pipe Line Company secures its gas from the Humble Oil and Refining Company the average price for gas at the well head is less than one and three-quarter cents per MCF, according to the sworn statement of the representatives of the Humble Oil and Refining Company; yet the Humble Oil and Refining Company up until October 1, 1934, had been charging $.12½ per MCF at the well head and since that time has been charging $.08 per MCF. In an effort to explain away this vast discrepancy in prices, Mr. Sue, the Company's witness, said that the average price of natural gas was based upon the value of the casinghead gasoline extracted from the natural gas. That does not convince us that natural gas after casinghead gasoline has been extracted therefrom is any more or any less valuable for domestic purposes than natural gas from which no casinghead gasoline has been extracted, provided the Btu content is the same. The testimony in this case shows that since the M & M Pipe Line Company began operations the Humble Oil and Refining Company has delivered such gas to the M & M Pipe Line Company from wells in what is called a "dry gas sand" and also from the Humble Oil and Refining Company's gasoline extracting plant. This plant was in operation before the contract was signed with the M & M Pipe Line Company. Gas is produced along with the oil and is used as an oil lifting agency. This has a tendency to reduce operating expenses in connection with the production of the oil by the Humble Oil and Refining Company. Before the execution of the contract in question the Humble Oil and Refining Company had

been taking the gas produced along with the oil and running it through a stripping plant or a casinghead gasoline extraction plant where the casinghead gasoline was extracted and then the residue gas was repressured into the sand or was used for fuel and plant purposes. Very little, if any, additional equipment was installed to meet the requirements of the M & M Pipe Line Company contract.

"There are three steps in the repressuring stage, one when the gas is brought to a pressure of thirty-five pounds, one when it is compressed to a pressure of one hundred and fifty pounds, and one at about one thousand pounds. Practically all of the casinghead gasoline is extracted before the one hundred fifty pound stage is completed. The Company considers, for repressuring purposes, that the one hundred fifty pound stage is the beginning, and at that point the Company has been fully compensated for the cost of the gas. Therefore, we shall consider the gas as free at the one hundred fifty pound stage. This one hundred fifty pound pressure is more than sufficient to meet the requirements of the M & M Pipe Line Company. The record shows that at various times since the inception of the contract involved herein some gas has been taken from the dry gas sand to repressure the oil-bearing sand and some gas has been taken from the extraction plant and used in repressuring the dry gas sand. At times the M & M Pipe Line Company has been furnished gas by the Humble Oil and Refining Company from the dry gas sand and at other times from the extraction plant.

"Mr. Sue testified that his company's investment in equipment above the one hundred fifty pound stage was about $230,000. He further testified that the total operating expenses in connection with the entire plant was about $7,000 per month, of which one-third, or about $2,300, was allocated to the operations above the one hundred fifty pound stage. During 1934, 1,688,000 MCF of gas passed through the one hundred fifty pound stage of which 144,000 MCF went into the dry gas sand. We think this investment and operating expenses should be allocated on the basis of the volume of gas going into the dry gas sand as compared with that passing through the one hundred fifty pound stage and used for other purposes. About 9% of all the gas passing through the one hundred fifty pound stage went into the dry gas sand, and therefore, we think, that it is fair and equitable to al-

locate the $230,000 investment on that basis, that is, giving 9% or $20,700 to the investment necessary to repressure the gas into the dry gas sand. Nine per cent of the $2,300 per month operating expense would give $207 per month operating expense in connection with repressuring the dry gas sand, or $2,484 per year. This operating expense includes all amounts the Company has expended for replacements, maintenance and repairs in connection with the gasoline plant operations above the one hundred fifty pound stage. The $20,700 represents the investment as appears on the books of the Company. This property has been in use for several years and it is hardly probable that the present fair value would equal $20,700. However, if we assume that the present fair value is $20,700 and that $2,484 is the proper amount of operating expenses to be allocated to the dry gas sand, this would give a cost of about $.0275 per MCF for the 144,000 MCF gas inducted into the dry gas sand during the year 1934.

· "As the Humble Oil and Refining Company has voluntarily dedicated a portion of its properties to the public use and has thereby become a gas utility, we think that that company is duty bound to furnish gas to the M & M Pipe Line Company at a fair and reasonable price consistent with reasonable allowances for return, operating expenses and depreciation. The testimony in this case shows that the Humble Oil and Refining Company could furnish to the M & M Pipe Line Company gas before it has made its final way through all of the stages of compression. In other words, when the gas has passed through the one hundred fifty pound stage it could be furnished to the M & M Pipe Line Company at a cost of only $.0275 per MCF. The testimony shows that some gas was furnished M & M at this stage. It seems to us that there is little necessity for repressuring the gas into the dry gas sand, except that the dry gas sand can be used as a reservoir for the residue gas after the casinghead gasoline has been extracted therefrom. However, this record shows that out of 203,000 MCF of gas sold to the M & M Pipe Line Company in 1934 that 144,000 MCF came from the extraction plant. The balance of 60,000 MCF came direct from the dry gas sand. If the Humble Oil and Refining Company furnished the M & M Pipe Line Company gas from the extraction plant, based upon the figures submitted, the cost of the gas to the M & M Pipe Line Company should not exceed $.0275 per MCF. In any event if the cost of inducting the gas into the dry gas sand, which was $.0275 per MCF, should be added to the average price of the gas according to the sworn quarterly reports of the Humble Oil and Refining Company, which average price was $.0165 per MCF, this would give a total value of the gas at less than $.045 per MCF.

"The Humble Oil and Refining Company offered as evidence Exhibit No. 23, which purports to show the total investment, operating revenue and operating expenses of the three wells and leases from which the M & M Pipe Line Company is taking a portion of gas sold to it. This exhibit shows a total investment of $24,478.89. It shows a total revenue of $44,061.26, and a total operating expense of $16,050.82. Deducting the operating expense from the total revenue gives a net revenue of $28,010.44. These operating expenses include all cost of replacements, repairs and maintenance to the wells and leases from the time the wells were drilled. Mr. Sue testified that the present fair value of these wells would be about $275 each, or a total of $825. For the purpose of this calculation, let us assume that the present fair value is the total investment as shown by Exhibit No. 23. These wells were drilled in 1927, 1928 and 1929. A seven per cent return per annum for seven years would be $11,994.66, which deducted from the net revenue of $28,010.44, leaves $16,015.78 excess earnings.

"If we applied a 7% return and 5% for amortizing the leases to the $825 value testified to by Mr. Sue, and use $2,292.99 as operating expenses, the fair value of the 203,000 MCF of gas would be $.0117 per MCF.

"For the purpose of this calculation we will disregard Mr. Sue's testimony as to the $825 value of the wells, and we will also disregard in its entirety the total investment of $24,478.89, and instead adopt a present value of $15,000 for the equipment and the wells. The average annual operating expense over the period of seven years for the three wells is $2,292.99. Applying a 7% return on the $15,000 present fair value and 5% for amortizing the leases and using $2,292.99 as an average annual operating expense gives a total of $4,092.99. Based upon the foregoing calculations the 203,000 MCF gas purchased by the M & M Pipe Line Company from the Humble Oil and Refining Company should not have cost

more than $.02 per MCF at the well head. By adding the $.0275 for the cost of inducting the gas into the dry gas sand to this $.02 per MCF gives a total cost of $.0475 per MCF, after allowing a 7% return and a reasonable amount for operating expenses and amortization of the leases. We think that these calculations are most liberal to the Humble Oil and Refining Company. We see no reason why the cost of the gas to the M & M Pipe Line Company should exceed the cost of inducting such gas into the dry gas sand. The gas could be furnished to the M & M Pipe Line Company before it is repressured into the dry gas sand. Taking into consideration the average price for gas produced by the Humble Oil and Refining Company in Austin County as shown by the sworn quarterly Gross Receipts Tax Statements filed with the State Comptroller, which price was $.0165 for 1934, and based upon the calculations hereinabove made, we have come to the conclusion that the well head price for gas to be charged M & M Pipe Line Company by Humble Oil and Refining Company should not exceed $.05 per MCF. We think this rate is most liberal because the Humble Oil and Refining Company has already had the advantage of this gas as an oil-lifting agency, and further, has already extracted from said gas a considerable amount of casing-head gasoline, the exact amount of which was not introduced into this record. Whatever amount of money the Humble Oil and Refining Company receives from the M & M Pipe Line Company is additional revenue over and above that contemplated by the Company at the time this gasoline plant was built. It is interesting to note that the Humble Oil and Refining Company does not pay royalty upon the basis of $.08 or $.125 for all of the gas produced from its properties in the Raccoon Bend Area where the M & M Pipe Line Company purchases its gas. Mr. Sue testified that the Humble Oil and Refining Company pays the same price it charges the M & M Pipe Line Company for the gas used by it. However, the payee is the Humble Oil and Refining Company itself. In other words, it is taking money out of one pocket and putting it into the other. The royalty owner receives his royalty on the value of the gas as reflected by the quarterly Gross Receipts Tax Statements filed by the Humble Oil and Refining Company with the State Comptroller, and not upon the basis of the $.08 at the well head it charges M & M Pipe Line Company."

We have carefully read the statement of facts and the accompanying exhibits, and have reached the conclusion that the 5-cent rate is not unjust, unreasonable, or confiscatory, but, if anything, is what the Commission classed it as "most liberal" to Humble. It would extend this opinion to undue length without useful purpose to consider in detail all the various theories and hypotheses advanced by appellees in support of their several contentions. The problem, in the main, is one of proper allocation of capital investment and operating items taken from figures supplied alone by Humble's books, with the addition of expert views.

At the outset it should be held in mind that Humble's gas production is an exceedingly small portion of its business in this field. Its main business is the production of oil. That was the purpose of its acquisition of the leases and its prospecting operations thereunder. This fact, of course, does not in any way affect the Humble's right to a fair net return on its investment; but it does have material bearing upon the problem involved in determining fair and reasonable bases in arriving at such net return.

From the testimony of Mr. Sue, appellees' only witness, appellants list fifteen different estimates of the fair value of the gas predicated upon as many different theories or methods of allocation and accounting. These estimates range from a low of 10 cents to a high of 17.1 cents per MCF. The integrity of these estimates is seriously discounted by the fact that Humble entered into a voluntary (so-called "arm's length") contract with M & M, reducing the price from 12.5 cents to 8 cents per MCF, and extending the contract for an additional five-year period. Confronted with this palpable inconsistency, Mr. Sue explained that M & M was then $42,000 in arrears in its account with Humble, and the contract was made to insure payment of this arrearage. There are two obvious answers to this explanation: (1) Humble was amply secured in this arrearage by its lien upon M & M's properties; it could have terminated its contract and collected its debt and lien in full through foreclosure; (2) its manifest lost of 2 cents per MCF under Mr. Sue's low of 10 cents (10 cents—8 cents) would exceed during the life of the extended contract several fold the amount of the debt. We refer to the following decisions as determinative of the value of this character of expert testi-

mony: St. Joseph Stock Yards Co. v. U. S., 298 U.S. 38, 56 S.Ct. 720, 729, 80 L.Ed. 1033; Dayton P. & L. Co. v. Pub. U. Comm., 292 U.S. 290, 54 S.Ct. 647, 657, 78 L.Ed. 1267; Lindheimer v. Ill. Bell T. Co., 292 U.S. 151, 54 S.Ct. 658, 663, 78 L. Ed. 1182; Los Angeles G. & E. Corp. v. R. R. Comm., 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180; Knoxville v. Knoxville W. Co., 212 U.S. 1, 29 S.Ct. 148, 154, 53 L.Ed. 371.

■ Mr. Chief Justice Hughes, writing in the Stock Yards Case, said: "The weight to be accorded to the testimony of the experts cannot be determined without understanding their approach to the question and the criteria which governed their estimates."

And Mr. Justice Moody in the Knoxville Case: "The conclusion of the court below rested upon that most unsatisfactory evidence, the testimony of expert witnesses employed by the parties."

The following from Mr. Chief Justice Hughes in the Bell Telephone Case might appropriately be paraphrased in this connection: "The glaring incongruity between the effect of the findings below as to the amounts of return that must be available in order to avoid confiscation and the actual results of the company's business [here the extended contract] makes it impossible to accept those findings as a basis of decision."

As was said by Mr. Justice Cardozo in rejecting this character of evidence in the Dayton Case: "We shall hardly go astray if we prefer the test of conduct."

We will not burden this opinion with detailed statement of how these various estimates are arrived at; but will confine ourselves to certain general observations regarding the Commission's findings, which will cover in the main appellees' objections to such findings.

As regards gas from the dry gas sands, the Commission correctly took the then value of the producing wells, as the used and useful property in the gas production business.

The Commission was warranted in considering gas supplied from the stripping plant (150-pound stage) as free gas. Humble furnished no figures concerning the stripping plant operations, but eliminated the stripping plant altogether from its calculations, thus taking the gas originally at the 150-pound stage, the stage at which it was delivered to M & M. Humble's sworn value of the casinghead (wet) gas at the well for production tax purposes was .016482 cent per MCF. This figure, Mr. Sue testified, was the market value of wet gas for stripping purposes; in other words, the net value of gasoline resulting from operation of the stripping plant. No part of the repressuring plant was employed in connection with the portion of the residue gas that was delivered to M & M. Payment of production tax upon the well-head value of the wet gas was predicated, as we understand Mr. Sue's testimony, upon the proposition that the residue gas from the stripping plant had been processed and had passed the production stage. We are not here concerned with the correctness of this proposition.

Now, the contract authorized Humble to deliver either from the stripping plant residue or from the dry gas sand wells. It would therefore have been equitable, at least to Humble, to treat the gas production operation as a whole and estimate the value of M & M gas upon the basis of its whole taking from each source in the proportion that its entire taking bore to the entire production from each source. If this method had been adopted by the Commission, it would have further reduced the fair value of the product.

While no point is made upon the subject, we think the Commission allowance of 7 per cent. return upon the Humble investment is "most liberal" in view of the low interest rate prevailing then and now.

■ We are not here concerned with whether the methods, reasoning, or bases of computation, allocation, etc., employed by the Commission are in every respect free from criticism, but only with the ultimate results, the "totality of consequences." West O. & G. Co. v. Pub. U. Comm., 294 U. S. 63, 55 S.Ct. 316, 79 L.Ed. 761; Wabash. V. E. Co. v. Young, 287 U.S. 488, 53 S.Ct. 234, 77 L.Ed. 447; Railroad Comm. v. Galveston C. of C., 105 Tex. 101, 145 S.W. 573; also Dayton, Bell Telephone, and Los Angeles Cases above.

■ The Commission's orders are prima facie valid, and the burden rested heavily upon appellees to show them otherwise. See Lone Star Gas Case (above). 86 S.W. (2d) 484, at page 498, and authorities there cited. We are unable to conclude from a review of the entire record that this burden has been successfully met.

We overrule the contention of interveners to the effect that the order was void because they were not madé parties to or given notice of the hearing. The leases and division orders executed by them expressly authorized Humble to sell the gas, only accounting to them for their share of the proceeds as provided in these instruments. They were not parties to the contract with M & M, nor with the extension agreement. The record does not show that they were even consulted in the making of these agreements, but only that they received and accepted payments in accordance therewith. While they were represented by separate counsel in the case, the record does not show that such counsel took any part in the trial other than to show that their clients were not parties to the hearing and that one of them had no previous knowledge of the hearing. The only interest they had in the controversy was whether the Humble was accorded a fair price for the gas. In obtaining such fair price the Humble was their agent and representative with plenary power to act. As we have above held, the contract with M & M dedicated the gas supplied thereunder to public use. Interveners were bound by that contract and its subsequent modification both by express authorization and subsequent ratification. There is no essential difference between the Commission's fixing the price and Humble's agreement thereto, had such been the case. There is no suggestion of criticism by interveners of any act done by Humble which to any degree worked to their detriment, or affected their interests deleteriously. Whether under other circumstances lessors under mineral leases are necessary parties to proceedings of this character, we are not called upon to decide. That they were not necessary parties under the instant record showing we think is clear.

The trial court's judgment is reversed, the injunction dissolved, and judgment is here rendered in favor of appellants.

Reversed and rendered.